UNITED STATES of America, Plaintiff,

v.

ONE (1) LOT OF APPROXIMATELY TWENTY THOUSAND (20,000) PAIRS OF COUNTERFEIT BLUE JEANS BEARING THE JORDACHE TRADE-MARK, Defendant.

No. C–C–83–936–M.

United States District Court, W.D. North Carolina, Charlotte Division.

Jan. 2, 1985.

**4.** In so holding, we express no opinion on the merits of Thompson's claim or on the defend- ants' defense of laches.

Richard S. Poe, Asst. U.S. Atty., Charlotte, N.C., for plaintiff.

W. Thad Adams, III, Charlotte, N.C., for Jordache Enterprises, Inc.

Robert A. Izard, Jr., Moore, Van Allen, Allen & Thigpen, Charlotte, N.C., for Selbo, S.A. de C.V.

Ronald E. Bogle, Hickory, N.C., intervenor, CMI, Inc.

## ORDER

McMILLAN, District Judge.

On December 13, 1983, the government filed a complaint for forfeiture *in rem* of twenty thousand (20,000) pairs of allegedly counterfeit blue jeans bearing the Jordache trademark. These jeans had been seized by the United States Customs Service in Charlotte on August 4, 1983. On January 18, 1984, CMI, Incorporated ("CMI"), a Charlotte-based trading company, informed the court of its claim for the jeans. On February 13, 1983, Selbo, S.A. de C.V. ("Selbo"), a Mexican wholesaler, made a claim for the jeans. A third claim was made by Jordache Enterprises, Incorporated ("Jordache"), on February 27, 1984.

This case was heard on November 19, 1983, on cross-motions for summary judgment filed by the government, by CMI, and by Selbo. Jordache joined in the government's motion for summary judgment.

By verified claims and affidavits of the parties, the court finds the uncontested facts to be as follows:

1. Selbo, S.A. de C.V. is a Mexican corporation engaged in the exportation and importation of goods from and to the Republic of Mexico. CMI, Incorporated is a North Carolina corporation engaged in buying wearing apparel in bulk quantities from manufacturers and other vendors and selling those goods to other wholesalers.

2. On or about July 7, 1983, Selbo and CMI entered into an agreement in which Selbo agreed to sell and CMI agreed to buy thirty thousand (30,000) pairs of jeans bearing the Jordache label. The sale price of the jeans was six dollars, sixty-seven cents ($6.67) each. Under the terms of the

agreement, the jeans were to be delivered by Selbo to CMI, F.O.B. Mexico City.

3. On or about July 27, 1983, Selbo, in order to fulfill its contractual obligations to CMI, purchased twenty thousand (20,000) pairs of jeans from Terrifico, a Mexican corporation engaged in the manufacture of clothing. At the time of the purchase, Terrifico provided Selbo with a certified copy of a document showing that Celine, S.A., an affiliate of Terrifico, was the registered owner and authorized user of the trademark "Jordache" in Mexico.

4. Previously, Selbo had assured CMI that Terrifico's trademark was valid. The vice president of CMI met with Mexican government officials who verified that Terrifico had the lawful trademark for Jordache in Mexico and provided him with a copy of that trademark. CMI also asserts that Selbo represented to it that the jeans could be lawfully imported in the United States.

5. Neither CMI nor Selbo made any attempt to contact Jordache directly, either at its corporate office in New York or through its Mexico City attorney, to confirm the authenticity of Terrifico's trademark or to discover if the trademark rights they had been assured were owned by Terrifico in Mexico allowed the importation of the jeans into the United States.

6. According to Selbo, just prior to delivery, and at the express request of and as an accommodation to CMI, Selbo agreed to deliver the jeans to CMI at Charlotte, North Carolina.

7. Prior to shipment, CMI paid Selbo for ten thousand (10,000) pair of jeans with a cashier's check for $66,700. The second ten thousand (10,000) pair were to be paid for with a letter of credit.

8. On or about August 3, 1983, representatives of Selbo had the jeans placed on an airplane for shipment to the United States.

9. When the jeans reached the United States, a customs agent determined through reference to the customs manual that "Jordache" is a registered trademark of Jordache Enterprises, Incorporated.

10. Local customs officials contacted Mr. Robert A. Spiegelman, attorney for Jordache, who advised them that Jordache did not have and never did have a licensee and manufacturer of Jordache jeans in Mexico and that all jeans exported from Mexico were, therefore, counterfeit and unauthorized.

11. Pursuant to this investigation and under the authority of 19 U.S.C. § 1526 and 15 U.S.C. § 1124 prohibiting the importation and introduction into commerce of the United States items bearing a registered United States trademark by persons other than owners, assignees or licensees of the trademark, the government seized the jeans as a "prohibited importation" under 19 C.F.R. § 133.21(a).

12. Pursuant to 19 U.S.C. § 1606, the District Director of Customs in Wilmington, North Carolina has appraised the blue jeans and determined their domestic value to be $306,200.

13. Jordache represents, through its New York attorney, that the minimum wholesale price of this particular type of Jordache jeans is nineteen dollars ($19) a pair. Retail value for genuine Jordache jeans is about forty dollars ($40) a pair.

## CONCLUSIONS OF LAW

1. The relevant importation restrictions state that,

> ... [I]t shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a ... corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office ... and if a copy of the certificate of registration of such trademark is filed with the Secretary of Treasury, ... unless written consent of the owner of such trademark is produced at the time of making entry.

19 U.S.C. § 1526(a). Merchandise imported into the United States in violation of this section "shall be subject to seizure and forfeiture for violation of the customs laws." 19 U.S.C. § 1526(b).

■ 2. The court concludes, on the basis of uncontroverted evidence, that the merchandise in question (twenty thousand (20,000) pair of blue jeans bearing the Jordache label) bears a trademark owned by a corporation organized with the United States and whose trademark is registered in the Patent and Trademark office and that no written consent of the owner of such trademark was produced at the time of making entry into the United States.

3. The merchandise in question is therefore, as a matter of law, subject to seizure and forfeiture. 19 U.S.C. § 1526(e) states in pertinent part:

Any such merchandise bearing a counterfeit mark ... imported into the United States ... shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws.

■ 4. In order to secure forfeiture under 19 U.S.C. § 1526(b), the United States must show the existence of facts sufficient to establish probable cause that merchandise, bearing a trademark owned by a United States corporation and manufactured in a foreign country, was introduced into the United States without the permission of the trademark owner. The court finds that on the basis of the uncontroverted sworn evidence, the government has made such a showing.

■ 5. Once probable cause is shown, the burden of proof is upon the *claimant* "in all suits or actions brought for the forfeiture of any ... merchandise ... where the property is claimed by any person ..." 19 U.S.C. § 1615.

6. Claimants Selbo and CMI state that in all matters pertaining to sale and purchase of the blue jeans, they acted "innocently, prudently and under the reasonable good faith belief that Terrifico was the owner and authorized user of the Jordache

trademark and that Terrifico assigned to Selbo the right to resell the jeans to CMI in the United States." (Selbo's verified petition for remission, filed February 13, 1983, at paragraph 18.)

■ 7. The law provides that, as a general rule, innocence is no defense to a forfeiture action. *J.W. Goldsmith-Grant Co. v. United States*, 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921).

■ 8. The Supreme Court, in *Calero-Toledo v. Pearson*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), indicated in *dicta* that in some circumstances due process might be offended by a forfeiture. In order to make out a claim of violation of due process, an owner of property would have to show both that he was innocent of any wrongdoing and that either (a) the property was either taken without his consent, or (b) he not only was uninvolved in and unaware of wrongdoing but also he had done all he reasonably could have done to prevent proscribed use of the property. In *Calero-Toledo*, the court found that even though the two yacht owners/claimants were innocent of any wrongdoing themselves in lending their boat to two men who left one marijuana cigarette on the boat, they had not shown that they had done all that reasonably could be expected to prevent the proscribed use of the property. Therefore, due process did not prevent forfeiture of the entire yacht to the government.

9. Claimants cite two cases where courts found that such a showing had been made. *In United States v. One Tintoretto Painting*, 691 F.2d 603 (2d Cir.1982), an art dealer attempted to smuggle a valuable painting into the United States under false pretenses. The court found that the owner of the painting had raised sufficient factual issues to preclude the granting of summary judgment by showing that he not only was innocent of wrongdoing but also had done all that reasonably could be expected to determine that the art dealer was reputable and that the painting was being handled legally. In *United States v. One 1976 Lincoln Mark IV*, 462 F.Supp. 1383 (W.D.

Pa.1979), the brother-in-law of the claimant (who lived in the same house) borrowed the owner's automobile to transport heroin. The court held that forfeiture statutes are intended to penalize only those who are significantly involved in criminal activity and that the claimant both was innocent of illegal activity and had done all that reasonably could have been expected to prevent the proscribed use of his property.

10. The above-cited cases are not applicable to the case before the court. In those cases, the owner of the defendant property was a third party admitted by all not to have been involved in any even questionable, much less illegal, activity. The claimant in *One Tintoretto Painting* entrusted his painting to an art dealer who, in turn, tried to import the painting without declaration of its true value. In the *1976 Lincoln Mark IV* case, the only activity of the claimant was to lend his car to his brother-in-law. In contrast, claimants here are the parties which engaged in the very act which resulted in seizure of the defendant property, that is, their attempt to import the defendant blue jeans into the United States.

11. Even if the standards set out in *Calero-Toledo* did apply in this case, claimants have not made a showing that they did all that reasonably could be expected to prevent proscribed use of the property. What claimants did do was to rely on the verbal representations of the manufacturer and Mexican government officials and on certain certified Mexican government documents that purported to show that Terrifico, through its affiliate, Celine, held a valid Mexican trademark and the concomitant rights to manufacture and sell jeans bearing the Jordache trademark in Mexico. Additionally, CMI relied on representations by Selbo of Selbo's right to sell CMI the jeans and of CMI's right to sell the jeans in the United States. What the claimants did *not* do was to check with the Customs Office, with Jordache offices in the United States or with Jordache counsel in Mexico, or to look at the United States Patent and Trademark registrations to verify Terrifico's rights in Mexico and, more pertinently, to ascertain Selbo's and CMI's rights to import the jeans into the United States.

12. Claimants' arguments center on the reasonableness of their belief that Terrifico held the Jordache trademark rights in Mexico. Reasonable or not, that belief is irrelevant to a determination of this case on summary judgment. Claimants provide no evidence nor forecast that they would be able to provide any evidence to support a finding that a right, through Terrifico, to buy and sell the jeans *in Mexico* would translate in any fashion into a right to export the jeans *to the United States* for sale in this country.

13. The court finds that there is no genuine issue of material fact raised by the evidence presented on the crucial issue in this case, that is, did the claimants both act innocently and do all that reasonably could have been expected to prevent the proscribed use of their property. As a matter of law, the court finds that even if innocent of any wrongdoing, neither CMI nor Selbo did all that reasonably could have been expected to determine, before attempting to import the jeans into the United States, that those jeans bore a valid trademark and that they were entitled, as assignees of Terrifico, to sell jeans bearing that trademark in the United States. The United States is, therefore, entitled to summary judgment on its claim for forfeiture of the jeans.

14. The only remaining issue is what is to be done with the blue jeans. The statute providing for the forfeiture of merchandise bearing a counterfeit mark provides as follows for its disposition:

> Upon seizure of such merchandise, the Secretary [of the Treasury] shall notify the owner of the trademark, and shall, after forfeiture, obliterate the trademark *where feasible* and dispose of the goods seized—
>
> (1) by delivery to such Federal, State and local government agencies as in the opinion of the Secretary have a need for such merchandise,

(2) by gift to such eleemosynary institutions as in the opinion of the Secretary have a need for such merchandise,

(3) more than 1 year after the date of forfeiture, by sale by appropriate customs officers at public auction under such regulations as the Secretary prescribes, except that before making any sale the Secretary shall determine that no Federal, State or local government agency or eleemosynary institution has established a need for such merchandise under paragraph (1) or (2), or

(4) *if the merchandise is unsafe or a hazard to health,* by destruction.

19 U.S.C. § 1526(e) (emphasis added).

15. The applicable regulations, entitled "Disposition of Forfeited Merchandise," trace the language of the statute:

(c) *Articles bearing a counterfeit trademark.* The Commissioner of Customs or his designee shall dispose of forfeited articles bearing a counterfeit trademark after obliteration of the trademark, *where feasible,* in the following manner:

(1) *Government use.* By delivery to any Federal, State or local government agency which, in the opinion of the Commissioner or his designee, has established a need for the article.

(2) *Gifts to charities.* By delivery to any charitable institution which, in the opinion of the Commissioner or his designee, has established a need for the article(s).

(3) *Sale.* If more than 1 year has passed since the forfeiture, the article(s) may be sold at public auction by the Commissioner or his designee. Prior to the sale, the Commissioner or his designee shall determine that a need for the article has not been established by any government organization or charitable institution under paragraph (c)(1) or (c)(2) of this section.

(4) *Destruction. If the article is unsafe or a health hazard,* it shall be destroyed.

19 C.F.R. § 133.52 (emphasis added except as to section titles).

16. Although this court has been unable to locate any applicable case law, it appears from the language of the statute and regulations that the responsibility for deciding on the ultimate disposition of the merchandise is with the Executive Branch, either through the Secretary of the Treasury, as provided for in the statute, or through the Commissioner of Customs or his designee, as provided for in the regulations. Therefore, the ultimate decision on disposition of the jeans must be left to the government to be made within the bounds of the statute and regulations.

17. It is clear, however, that the alternative of destruction of the jeans, promoted by Jordache, is only to be exercised "if *the merchandise is unsafe or a hazard to health.*" Otherwise, the government *shall,* after obliterating the trademark *"where feasible",* deliver the jeans to a government agency, give them to a charitable institution or sell them at public auction. The phrase "where feasible" clearly modifies "obliterate the trademark" and *not* disposal by means other than destruction.

18. The government, through the United States Attorney, has indicated to the court that it has received requests for the jeans from at least one state agency and from charitable institutions. The court takes this statement as a good-faith commitment on the part of the government to dispose of the jeans in a manner comporting with the language and intent of the statute, i.e., not by destroying them but by giving them to such agencies or charitable institutions "as in the opinion of the Secretary have a need for such merchandise."

IT IS THEREFORE ORDERED, that plaintiff's motion for summary judgment is GRANTED.

Counsel for the United States is directed to draft and tender a judgment appropriate to the findings and conclusions made in this order.