**UNITED STATES of America,**
**Plaintiff,**

v.

**10,510 PACKAGED COMPUTER TOWERS, More or Less, 200 Packaged External Hard Drives, More or Less, and 449 Retail Boxes, More or Less, All Bearing One or More of the Following Marks on the Packaging, "UL" Within a Circle, "UL ... approved," or a Reverse "UR", Defendants.**

No. C99–4041 CAL.

United States District Court,
N.D. California.

June 27, 2001.

---

Patricia J. Kenney, Assistant U.S. Attorney, Office of U.S. Attorney, San Francisco, CA, for plaintiff.

Mattaniah Eytan, Mattaniah Eytan Law Offices, San Francisco, Gary C. Cooper, Horton Whiteley & Cooper, Oakland, CA, for defendant.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

LEGGE, District Judge.

This is an *in rem* seizure and forfeiture case, which is now before the court on

cross-motions for summary judgment. It concerns the disposition of 10,510 packaged computer towers, imported from Taiwan and seized at the Port of Oakland, bearing certification marks registered to United Laboratories. The parties—the U.S. Customs Service (the "government") and Antec, Inc. ("Antec" or "claimant")— have stipulated to the essential facts of the case. The case is therefore now one of statutory construction. The statute at issue, 19 U.S.C. section 1526, governs the government's rights and duties in seizing imported merchandise bearing counterfeit marks.

Having considered the moving and opposing papers, the record, the arguments of counsel, and the applicable law, the court now issues the following order and directs judgment thereon.

## I.

The United States Customs Service administratively seized several shipments of packaged computer towers between November 18, 1998 and February 1, 1999 as they came into the Port of Oakland. Claimant Antec was importing the towers from Taiwan. A computer tower is basically the shell of a computer, without the internal hardware such as disk drives and circuit boards installed. The computer towers do contain a power supply, but they need to have more hardware installed before they become working machines.

In this case, the packaged computer towers and retail boxes shipped along with them bear several key markings. The parties submitted several photographs of the packaged towers, the best of which is found attached as Exhibit K to the Joint Statement of Undisputed Facts. The photographs show the markings on which the administrative seizure was based, which are: (1) the reverse "UR" located on the

line just below the Weight; and (2) the line below, indicating that the contents are "UL … approved." *See* Joint Statement, Exh. K.

The reverse-"UR" and "UL"-in-a circle marks are certification marks owned by Underwriters Laboratories Inc. Underwriters Laboratories is an independent, not-for-profit testing laboratory that tests representative samples of products to determine whether they comply with nationally recognized safety standards and requirements. *See United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios,* 220 F.3d 539, 540–541 (7th Cir.2000) (explaining the role of Underwriters Laboratories and the process it uses to certify goods). The reverse-"UR" and "UL"-in-a-circle marks signify that the electrical and related components have been inspected and satisfy the safety standards of Underwriters Laboratories. The reverse-"UR" is placed exclusively on electrical components (for instance, a power source or a fan) of multi-component devices. The familiar "UL"-in-a-circle is placed on a wide variety of primarily electrical devices. Underwriters Laboratories has registered both marks with the United States Patent & Trademark Office ("PTO"), and the registrations were valid and subsisting at the time of the seizure. *See* Joint Statement, Exhs. L & M.

The Customs Service administratively seized the packaged computer tower shipments at issue in this case after confirming that: (1) the items bear the reverse-"UR" and "UL … approved" marks; (2) the marks are owned by and validly registered to Underwriters by the PTO; and (3) Underwriters did not authorize the reverse-"UR" or "UL … approved" marks to be used on the seized goods. Concluding that the goods were therefore counterfeit within the meaning of the applicable statutes, the Customs Service sent notice of their administrative seizure to claimant Antec.

Antec filed a claim and cost bond to cover the shipments, and the Customs Service referred the matter to the U.S. Attorney for institution of judicial forfeiture proceedings. This complaint for forfeiture was then filed in this court.

## II.

Summary judgment should be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "At the summary judgment stage, the district court is not to weigh the evidence or determine the truth of the matter but should only decide whether there is a genuine issue for trial." *Washington v. Garrett*, 10 F.3d 1421, 1428 (9th Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting

Fed.R.Civ.P. 56(c)). When the nonmoving party will bear the burden of proof at trial on a dispositive issue, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c) & (e)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S., at 249–50, 106 S.Ct. 2505 (citations omitted).

## III.

19 U.S.C. section 1526(e), entitled "Merchandise bearing counterfeit mark; seizure and forfeiture; disposition of seized goods," provides in relevant part:

> Any [merchandise of foreign manufacture] bearing a counterfeit mark (within the meaning of section 1127 of Title 15) imported into the United States in violation of the provisions of section 1124 of Title 15, shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws.

Under the statute the government "shall" seize merchandise if it: (1) is of foreign manufacture; (2) bears a counterfeit mark within the meaning of 15 U.S.C. section 1127; and (3) was imported in violation of 15 U.S.C. section 1124. Such merchandise is then subject to forfeiture in the absence of the written consent of the trademark owner.[1]

The parties do not dispute that computer towers in this case are "of foreign man-

---

1. A subsequent question raised by claimant is what the government must do with the goods if they are forfeited. The statute provides: Upon seizure of such merchandise, the Secretary shall notify the owner of the trademark, and shall, after forfeiture, destroy the merchandise. Alternatively, if the merchandise is not unsafe or a hazard to

health, and the Secretary has the consent of the trademark owner, the Secretary may, obliterate the trademark where feasible and dispose of the goods seized—
(1) by delivery to such Federal, State, and local government agencies as in the opinion of the Secretary have a need for such merchandise,

ufacture" within the meaning of the statute. Thus the first prong of the inquiry is satisfied. The two remaining prongs of section 1526(e) are therefore the focus of the analysis.

The second prong of section 1526(e) requires that the contested merchandise bear a counterfeit mark within the meaning of 15 U.S.C. section 1127, commonly known as the Lanham Act. The Lanham Act states: "The term 'mark' includes any trademark, service mark, collective mark, or certification mark." 15 U.S.C. § 1127. The parties agree that the marks at issue here are certification marks.[2] The next question is whether the marks are counterfeit. The Lanham Act provides: "A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." *Id.* Federal courts have held that the inquiry into whether a mark is "counterfeit" must be conducted "from the standpoint of an average purchaser." *Montres Rolex, S.A. v. Snyder,* 718 F.2d 524, 530–32 (2d Cir. 1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

Finally, the third prong of section 1526(e) requires that the contested merchandise have been imported into the United States in violation of 15 U.S.C. section 1124, another section of the Lanham Act. 15 U.S.C. section 1124 provides in pertinent part:

[N]o article of imported merchandise which shall copy or simulate the name of any domestic manufacture, or manufacturer, or trader, or of any manufacturer or trader located in any foreign country which, by treaty, convention, or law affords similar privileges to citizens of the United States, or which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that it is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured, shall be admitted to entry at any customhouse of the United States[.]

## IV.

Claimant Antec makes four arguments for summary judgment: (1) trademarks,

(2) by gift to such eleemosynary institutions as in the opinion of the Secretary have a need for such merchandise, or
(3) more than 90 days after the date of forfeiture, by sale by the Customs Service at public auction under such regulations as the Secretary prescribes, except that before making any such sale the Secretary shall determine that no Federal, State, or local government agency or eleemosynary institution has established a need for such merchandise under paragraph (1) or (2).
19 U.S.C. § 1526(e).

As the statutory language makes clear, the court need not resolve this question because "responsibility for deciding on the ultimate disposition of the merchandise is with the Executive Branch ." *United States v. One (1) Lot of Approximately Twenty Thousand (20,-000) Pairs of Counterfeit Blue Jeans Bearing*

*the Jordache Trademark,* 601 F.Supp. 476, 481 (W.D.N.C.1985).

**2.** The Lanham Act provides:
The term "certification mark" means any word, name, symbol, or device, or any combination thereof—
(1) used by a person other than its owner, or
(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter, to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.
15 U.S.C. § 1127.

not certification marks, are the only type of marks covered by 19 U.S.C. section 1526(e); (2) the marks on the seized merchandise are not "counterfeit" within the meaning of 19 U.S.C. section 1526(e) and any dispute as to the reverse-"UR" should be determined on the basis of an agreement between Underwriters and Antec; (3) only the most egregious violations are proscribed by 19 U.S.C. section 1526(e), and the alleged counterfeiting in this case is not sufficiently egregious; and (4) the government did not have probable cause to seize the merchandise because it relied on the representations of Underwriters in determining whether the marks were counterfeit.[3]

The government argues that certification marks, and not just trademarks, fall within the ambit of 19 U.S.C. section 1526(e) because the Lanham Act, incorporated by reference into the statute, defines the term "mark" broadly to include certification marks. The government contends that all of the packaged computer towers and the retail boxes seized bear two certification marks—a reverse-"UR" as well as the words "UL ... approved"—without the approval or authorization of their registered owner, Underwriters Laboratories. Accordingly, the government argues that these are "marks" and that they are "counterfeit" within the meaning of 19 U.S.C. section 1526(e). As to the harshness of the remedy of forfeiture, the government argues that counterfeiting is a serious offense that Congress intended to punish, without regard to the "egregiousness" of the violation. Finally, the government

contends that it only bears the burden of establishing probable cause for seizure, which it did, and the burden then shifts to claimant to prove that the property was not counterfeit, which it did not.

## V.

### A. The government is authorized to seize imported merchandise bearing counterfeit certification marks.

█ The court must decide whether 19 U.S.C. section 1526(e) applies to this case. Claimant argues that section 1526 as a whole applies only to *trademarks*, and not to certification marks. *See* Claimant's Motion at 13:19–14:9; Reply at 6:1–20. The government contends that subsection 1526(e) also applies to certification marks because it expressly incorporates the Lanham Act, which extends trademark protections to certification marks. *See* Pl. Motion at 3:11–4:21; Reply at 4:3–5:2. The court ordered further briefing on the question.

The parties have located only one published opinion that assumes, without much discussion, that subsection 1526(e) applies to certification marks as well as trademarks. *See United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios,* 1999 WL 1579747, *3 (N.D.Ill.), *aff'd* 220 F.3d 539 (7th Cir.2000) ("The unauthorized representation that defendant radios were certified by UL rendered them counterfeit under 15 U.S.C. § 1127. Accordingly, defendant radios are subject to forfeiture.

---

**3.** In opposition to the government's cross-motion for summary judgment, Antec further argues: (5) in previous cases the customs service has treated the packaging alone as counterfeit, releasing the product without the packaging; and (6) the prior conduct of United Laboratories in this case is evidence that the merchandise should not be regarded as counterfeit and that other, "less draconian"

remedial options should therefore be explored. *See* Claimant's Opp. at 2–3. As explained *supra,* in footnote 1, the statute vests decisionmaking power as to the eventual disposition of properly seized and forfeited goods in the Executive. The court therefore confines its analysis to the propriety of the seizure and forfeiture.

*See* 15 U.S.C. § 1124; 19 U.S.C. §§ 1526(e), 1595a(c)(2)(C).").

Claimant points out that section 1526, entitled "Merchandise Bearing American Trademark," repeatedly uses the term "trademark," and not "certification mark" or "mark," to define the class of merchandise subject to seizure. *See* Claimant's Suppl. Mem. at 2:11–14. Claimant also correctly notes that the Lanham Act and the cases construing it distinguish trademarks from certification marks. *See id.* at 2:14–3:21 (discussing 15 U.S.C. § 1127). Based on these two observations, claimant concludes that subsection 1526(e) should apply only to trademarks and not to certification marks.

The difficulty with claimant's argument, however, is that subsection 1526(e), entitled "Merchandise bearing counterfeit mark; seizure and forfeiture; disposition of seized goods", the subsection at issue in this case, uses the general term "mark" as well as the more restricted term "trademark":

> Any [merchandise of foreign manufacture] bearing a counterfeit *mark* (within the meaning of section 1127 of Title 15) imported into the United States in violation of the provisions of section 1124 of title 15, shall be seized and, in the absence of the written consent of the *trademark* owner, forfeited for violations of the customs laws.

19 U.S.C. § 1526(e) (emphasis added). Subsection 1526(e) expressly incorporates a definition of "mark" that is broader than "trademark." *See* 15 U.S.C. § 1127 ("The term 'mark' includes any trademark, service mark, collective mark, or certification mark.").

If claimant's interpretation were accepted, there would be an internal inconsistency in subsection 1526(e). That is, claimant would limit the coverage of subsection 1526(e) to trademarks even though subsection 1526(e) expressly incorporates a definition of "mark" in 15 U.S.C. section 1127, that clearly includes certification marks.

As the government notes, moreover, the protections afforded to trademarks under the Lanham Act also cover certification marks. The Lanham Act provides in pertinent part:

> Subject to the provisions relating to the registration of trademarks, so far as they are applicable ... certification marks ... shall be registrable under this chapter, in the same manner and with the same effect as are trademarks ... and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks.

15 U.S.C. § 1054. Claimant argues that the words "in this chapter" limit the protections afforded to certification marks to the protections articulated in the Lanham Act itself. However, the statutory authority relied on by the government for the seizures is not the Lanham Act but rather the seizure and forfeiture statute, which expressly extends protection to merchandise "imported into the United States in violation of the provisions of section 1124 of Title 15." 19 U.S.C. § 1526(e). Thus, the question *whether a violation has occurred* should be analyzed with respect to 15 U.S.C. section 1124, but *the protection authorized* in case of a violation is governed by the seizure and forfeiture statute.

Close attention to how 15 U.S.C. section 1124 fits into the overall scheme of the Lanham Act confirms that marks generally, and not trademarks alone, are protected. 15 U.S.C. section 1124 states in relevant part:

> *[N]o article of imported merchandise* which shall copy or simulate the name of any domestic manufacture, or manufacturer, or trader, or of any manufacturer or trader located in any foreign country which, by treaty, convention, or law affords similar privileges to citizens of the

United States, or *which shall copy or simulate a trademark registered in accordance with the provisions of this chapter* or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that it is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured, *shall be admitted to entry at any customhouse of the United States* [.] (emphasis added).

The highlighted language appears to apply only to merchandise which copies or simulates a *trademark*. However, as discussed above, the Lanham Act elsewhere states that certification marks "shall be entitled to the protection provided in this chapter in the case of trademarks." 15 U.S.C. § 1054. Moreover, the language "or shall bear a name or *mark* calculated to induce the public to believe that the article is manufactured in the United States," read in concert with the definition of "mark" in section 1127, further undermines the notion that violations of section 1124 must always involve trademarks. It follows necessarily that importation of goods bearing copied or simulated certification marks, like importation of goods bearing copied or simulated trademarks, would violate 15 U.S.C. section 1124.

Given that subsection 1526(e) uses both the term "mark" and "trademark," claimant is correct that the statute is somewhat ambiguous. However, further considerations support the conclusion that the statute covers certification marks.

■ Pursuant to the so-called *Chevron* doctrine, the court is obliged to defer to an administering agency's permissible interpretation when construing an ambiguous statute:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (applying *Chevron* to related Customs regulations); *but see United States v. Mead,* —— U.S. ——, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (limiting the scope of *Chevron*-based deference).

Here the U.S. Customs Service, the agency charged with administering subsection 1526(e), has consistently interpreted the statute to authorize seizure and forfeiture of goods bearing counterfeit certification marks. The Customs Service adopted final guidelines, which were duly proposed and published for public comment. *See* Customs Bulletin and Decisions, Vol. 33, No. 10, p. 42 (March 10, 1999). The final guidelines are entitled "Guidelines for the Imposition of, and Mitigation of, Civil Fines under 19 U.S.C. 1526(f), Regarding Importations Bearing Counterfeit Marks (Trademarks, Service Marks, Collective marks, and *Certification Marks* )" (emphasis added). *See* Customs Bulletin and Decisions, Vol. 33, No. 43 (October 27, 1999).

The Guidelines state:

Through the amendment of 19 U.S.C. 1526(e) and the adoption of 19 U.S.C. 1526(f) in sections 9 and 10 of the Anti-counterfeiting Consumer Protection Act (the ACPA, Public Law 104–153, 110 Stat. 1386), Congress indicated its intent to control and prevent commercial counterfeiting and to increase civil penalties for the importation of merchandise bearing counterfeit trademarks.

Therefore, imported goods bearing a counterfeit mark (within the meaning of section 1127 of Title 15, which includes trademark, service mark, collective mark, and certification mark) shall be seized and forfeited and (except where the goods are not unsafe or a hazard to health, and Customs has the written consent of the trademark owner for an authorized alternative disposition) destroyed pursuant to 19 U.S.C. 1526(e) and civil penalties should be routinely imposed under 19 U.S.C. 1526(f).

*Id.* at 23 (emphasis omitted).

The Customs Service's interpretation of 1526(e) is supported by the legislative history of the ACPA. In 1996 Congress amended 19 U.S.C. section 1526 based on express findings that counterfeiting of marks: (1) has been connected with organized crime; (2) deprives legitimate trademark and copyright owner of substantial revenues and consumer good will; (3) poses health and safety threats to United States consumers; (4) eliminates United States jobs; and (5) is a multi-billion dollar drain on the United States economy. *See* The Anticounterfeiting Consumer Protection Act of 1996, P.L. No. 104–153, 110 Stat. 1386, Section 2.

Given Congress's concern about the health and safety threat posed by counterfeit merchandise to American consumers, it makes abundant sense to interpret the statute to prohibit the importation of merchandise bearing counterfeit certification marks. Certification marks, such as those owned by Underwriters Laboratories, attest to the quality and safety of the goods that bear them. Counterfeit certification marks falsely imply that the merchandise has been tested and approved for safety. American consumers rely on these representations. Thus, one of the policies underlying subsection 1526(e)—protection of American consumers from health and safety threats—will be substantially advanced by interpreting the statute to cover certification marks.

The Customs Service has routinely effected civil administrative seizures of goods bearing counterfeit certification marks since Congress passed the Anticounterfeiting Consumer Protection Act of 1996. *See* Stump Decl. at ¶ 3. In particular, the Customs Service has effected over 600 seizures of goods bearing counterfeit UL marks since 1997. *See id.* at ¶ 4.

For the reasons discussed above, the court concludes that under 19 U.S.C. section 1526(e) the government is authorized to seize merchandise of foreign manufacture bearing a counterfeit certification mark.

**B. The seized merchandise is merchandise of foreign manufacture bearing counterfeit marks within the meaning of 15 U.S.C. section 1127.**

Claimant maintains that the "UL ... approved" and reverse-"UR" markings on the packaged computers and retail boxes do not rise to the level of "counterfeit" within the meaning of 19 U.S.C. section 1526(e). *See* Claimant's Motion at 8:14–10:21; Reply at 3:8–6:1. Claimant argues that: (1) the purchasers of the computer towers are sophisticated computer assemblers and manufacturers who would know that the reverse-"UR" only refers to the single electrical component of the computer towers, *i.e.*, the power supplies, which were approved for marking by Underwrit-

ers Laboratories; (2) any dispute about the reverse-"UR" mark should be resolved by reference to the agreement between Underwriters Laboratories and Antec and not by resort to the seizure and forfeiture statute; (3) relevant legislative history establishes that the trademark counterfeiting legislation was only intended to reach "the most egregious forms of trademark infringement" and not the type of misuse alleged here; and (4) the "UL" mark on the packages is not enclosed in a circle and is therefore readily distinguishable from the Underwriters Laboratories mark.

■ The seizure and forfeiture statute incorporates the definition of a "counterfeit mark" supplied by 15 U.S.C. section 1127. *See* 19 U.S.C. § 1526(e). 15 U.S.C. section 1127, in turn, defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also* 19 C.F.R. § 133.21(a) (same). The leading case on point holds that the inquiry into whether a mark is "counterfeit" must be conducted "from the standpoint of an average purchaser." *See Montres Rolex, S.A. v. Snyder,* 718 F.2d 524, 530–32 (2d Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

■ Claimant's first argument is that the relevant purchasers in this case are sophisticated "systems integrators" who would not be deceived into thinking that a "UL ... approved" or reverse "UR" marking on the packaging refers to the entire computer tower. *See* Claimant's Reply at 3:14–22. The systems integrators would supposedly know this because only the electrical portion of products normally receive these marks, and the power supply is the only electrical portion of the computer towers. Moreover, claimant states that the systems integrators who purchase the products at issue generally do not require UL certification on the tower portion. Claimant makes these fac-

tual arguments based solely on the declaration of Andrew Lee, President of Antec, attached to its Reply brief.

However, the proper test for a counterfeit mark is whether, in the eyes of an "average" purchaser, the mark is "spurious" and "identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Assuming that claimant is correct that a systems integrator is the average purchaser of computer towers, Mr. Lee is not a systems integrator. His statements about what a systems integrator would know or would require are therefore without foundation and are not supported by a record. There is really no evidence in the record, other than the pictures of the contested merchandise, to support claimant's interpretation of the contested marks.

More importantly, the applicable test focuses on the *mark* itself, not on the conclusions an average purchaser would draw from the mark's relation to products within the package. Here, even a systems integrator would certainly regard the reverse-"UR" mark as "substantially indistinguishable" from Underwriters' registered mark. *Compare* Joint Statement, Exh. K *with id.,* Exh. M. In fact, claimant does not attempt to distinguish the mark on the packaged towers and retail boxes from the mark registered with the PTO. The mark is also "spurious" because its placement on the packages and boxes falsely suggests that Underwriters has inspected and certified the entire computer tower. *See especially id.,* Exh. K. The disputed mark is separated from the description of the power supply by a description of other general aspects of the tower, specifically the presence of 7 drive bays, the dimensions of the tower, and its weight. Further, the reverse-"UR" appears directly above a schematic representation of the entire

computer tower, not the power supply alone. Because the mark is placed in this manner, no reasonable trier of fact could conclude from the packaging alone that the reverse-"UR" refers to just the power supply. In sum, the reverse-"UR" mark is "substantially indistinguishable" from Underwriters registered mark, and the mark is "spurious" because it suggests that the entire computer tower has been tested and certified. This satisfies the definition of a counterfeit mark in 15 U.S.C. section 1127 as incorporated by 19 U.S.C. § 1526(e).

■ Claimant's second argument is that Underwriters Laboratories authorized Antec to use the reverse-"UR" in connection with its product, so the marks cannot be spurious. *See* Claimant's Motion at 8:20–22. The evidence reveals, however, that Underwriters gave Antec permission to place its reverse-"UR" mark only on the power supply *housed within the computer tower. See, e.g.,* Lee Decl., Exh. 2. Underwriters did not authorize use of the reverse-"UR" on the computer packages or with reference to the entire computer tower. *See* Claimant's Motion, Exh. 1 ("The package marking indicates to the customer that the entire assembly including the case is Recognized, when only the power supply inside the case is Recognized. Based on the information presented, the Recognized Component Mark is not authorized for this packaging."). Nor did Underwriters authorize Antec to use the language "UL ... approved" on the packaging. *See id.*

Even if the court accepts Mr. Lee's representation that Antec was given "no specific instructions ... which explained the requirements for marking the boxes containing the Underwriters Laboratories-approved power supplies," Lee Decl. at ¶ 14, this still would not alter the counterfeiting analysis. The analysis is not focused on the intent of the alleged counterfeiter, but rather on the mark itself. Antec's *scienter*

will be relevant in determining the ultimate disposition of the goods and the proper fine to impose; however, as explained above, these are matters for the Executive to decide, not this court. *See* 19 U.S.C. §§ 1526(e)-(f); Guidelines at 24–25 (describing "mitigating factors" to be considered in assessing fines under § 1526(f) including "lack of knowledge of the counterfeit nature of the mark").

Claimant's third argument cites to the 1984 legislative history of the criminal importation statute (18 U.S.C. § 2320), which states: "Because this act is intended to reach only the most egregious forms of trademark infringement, it does not affect cases in which the defendant uses a registered mark in connection with goods or services for which the mark is not registered." *See* Claimant's Reply at 3:25–28, 4:12–26. Aside from the fact that the cited language refers to an entirely different statute, its reference is to a criminal statute. It seems obvious that a criminal statute would reach only the "most egregious" acts of infringement, when there are civil remedies available for less egregious acts.

As discussed above, the statute now before the court, 19 U.S.C. section 1526, was amended in 1996 based on express findings that counterfeiting: (1) has been connected with organized crime; (2) deprives legitimate trademark and copyright owners of substantial revenues and consumer good will; (3) poses health and safety threats to United States consumers; (4) eliminates United States jobs; and (5) is a multibillion-dollar drain on the United States economy. *See* Anticounterfeiting Consumer Protection Act of 1996, P.L. No. 104–153, 110 Stat 1386, Section 2. It is clear that Congress enhanced the applicable anticounterfeiting legislation in 1996 in part to secure consumer safety.

■ Finally, Antec points out that the "UL"-in-a-circle mark does not appear on any of the seized products or packaging.

*See* Claimant's Motion at 10:4–21. In essence, Antec contends that the statement "UL ... approved" on the packages does not constitute a counterfeit of Underwriters' "UL"-in-a-circle mark. Although not "identical with" Underwriters' mark, the "UL ... approved" language is "substantially indistinguishable" from the mark in the eyes of an average purchaser. Since the "UL"-in-a-circle mark signifies Underwriters' approval of a package's contents, which is exactly what the offending language here denotes, even a sophisticated "systems integrator" would assume that the computer towers had been tested and approved by Underwriters. Further, this argument of claimant does not address the use of the reverse-"UR" mark, which is identical to Underwriters' mark in all particulars. In other words, the fact that the "UL"-in-a-circle is not precisely reproduced on the packaging is not dispositive because the reverse-"UR" mark suffices, in and of itself, to establish a violation.

Because there is no genuine issue of material fact that at least the reverse-"UR" marks on claimant's packages are "spurious" (*i.e.,* they falsely indicate that Underwriters Laboratories has tested and certified the computer towers) and are "substantially identical with, or substantially indistinguishable from" Underwriters' registered mark, the government prevails on the issue of the marks being counterfeit.

**C.** *The seized merchandise was imported in violation of 15 U.S.C. section 1124.*

Finally, the third prong of section 1526(e) requires that the contested merchandise have been imported into the United States in violation of 15 U.S.C. section 1124, which provides in pertinent part:

> [N]o article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter ... shall be admitted to entry at any customhouse of the United States[.]

As discussed above, it is undisputed that the merchandise in this case was "imported" and that Underwriters Laboratories' certification marks were registered with the PTO in accordance with the Lanham Act. The court also decided above that certification marks are entitled to the protections of section 1124, and that importation of goods bearing counterfeit certification marks would violate section 1124.

The standard for determining whether a mark is "counterfeit" is higher than whether a mark "shall copy or simulate" a registered mark.. *See generally Montres Rolex, S.A. v. Snyder,* 718 F.2d 524, 527–29 (2d Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984). As stated above, a counterfeit mark is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see also* 19 C.F.R. § 133.21(a). A "copying or simulating" mark is "one which may so resemble a recorded mark ... as to be likely to cause the public to associate the copying or simulating mark ... with the recorded mark." 19 C.F.R. § 133.22(a).

The court has already decided that the reverse-"UR" mark on the packaged computer towers was "substantially indistinguishable" from Underwriters Laboratories' registered mark. It necessarily follows that the offending mark copies or simulates the registered mark. Accordingly, the merchandise was imported in violation of 15 U.S.C. section 1124.

**D.** *The government had probable cause to seize the contested merchandise.*

▮ The government contends that it bears only the burden of establishing probable cause for seizing contested merchandise, and the burden then shifts to the claimant to establish by a preponderance

of the evidence that the goods are not counterfeit. *See* Pl. Motion at 7:12–18. "In forfeiture cases, the government must first make a preliminary showing of probable cause to believe that the property was used in the violation. The burden then falls upon the claimant either (1) to refute the government's showing of probable cause, or (2) to prove that the property was not used for the illegal purpose as alleged." *United States v. 66 Pieces of Jade and Gold Jewelry,* 760 F.2d 970, 973–74 (9th Cir.1985) (citations omitted); *see also United States v. One (1) Lot of Approximately Twenty Thousand (20,000) Pairs of Counterfeit Blue Jeans Bearing the Jordache Trademark,* 601 F.Supp. 476, 478 (W.D.N.C.1985).

■ The government maintains that probable cause existed in this case because it is undisputed that each of the contested packages bears the reverse-"UR" mark and the statement "UL ... approved." *See* Joint Statement at ¶¶ 5, 10, 15, 20, 25, 30, 35, 40, 45, 50; Exhs. A–K. And the government also provides unchallenged evidence that Underwriters Laboratories had registered its certification marks with the PTO. *See id.* at ¶¶ 51–56; Exhs. L–M. Finally, the government submits evidence that Underwriters Laboratories had not authorized Antec to use its marks in the manner demonstrated [4] and that Underwriters regards the use as "counterfeit." *See* Second Mickelson Decl. at ¶¶ 11–12. *See generally* Pl. Motion at 7:11–8:4; Reply at 1:26–2:13.

Claimant argues that the government cannot rely on the statements of Underwriters Laboratories to establish probable cause; instead the government is required to establish independently that the goods at issue are counterfeit before seizure.

Claimant asserts that the government's uncertainty regarding two issues at the time of seizure (the presence of power supplies in the computer towers and the scope of Underwriters' authorization to use the reverse-"UR" in connection with the power supplies) demonstrates that "probable cause did not then exist." Claimant's Reply at 3:3–7.

As discussed above, however, the placement of the reverse-"UR" mark clearly suggests that the entire computer tower and not just one of its components was inspected and approved by Underwriters Laboratories. Thus, even if the mark were approved as applied to the power source, this does not mean Antec was free to create the impression that the entire computer tower had been inspected and approved by Underwriters Laboratories. The "UL... approved" language on the boxes reinforces this conclusion, even if it does not independently establish a second violation. Nor does the government's lack of inquiry into the presence of the power supply within the towers vitiate its claim that the markings on the packaged towers were counterfeit at the time of seizure. The existence of the power supplies and the authorization for the reverse-"UR" *on the power supplies alone* do not undercut the government's position that *the packages bearing the marks,* which depict and describe the computer towers, were deceptively misleading in their use of the marks.

Finally, claimant's argument that the Customs Service is not entitled to rely on the representations of Underwriters Laboratories in seizing and forfeiting the contested merchandise lacks support. The statute expressly conditions forfeiture of the merchandise on "the absence of written consent from the trademark owner."

4. As discussed above, the evidence suggests that Underwriters did grant Antec permission to use the reverse-"UR" mark, but the only use authorized was on the component power supplies located within the towers. Underwriters did not authorize use of its marks in relation to the computers towers as a whole or on the packaging, as here.

19 U.S.C. § 1526(e). Thus, once the government had seized the disputed merchandise, it was required to contact Underwriters to ascertain whether or not it had offered written consent for the use of its marks under the circumstances. While it is true that Underwriters Laboratories is an interested party in the seizure and forfeiture proceedings, Underwriters is also the witness with the best evidence on the subject of the contested marks, whether they were validly registered with the PTO, whether the claimant had permission to use the marks on their goods, and whether the marks were counterfeit. *See, e.g., United States v. One (1) Lot of Approximately Twenty Thousand (20,000) Pairs of Counterfeit Blue Jeans Bearing the Jordache Trademark,* 601 F.Supp. 476, 478 (W.D.N.C.1985) (relying on the representations of Jordache attorney as to unauthorized use of the mark and counterfeiting to support probable cause). Claimant is free to rebut the evidence provided by Underwriters, as it has attempted to do here. This does not mean that the government cannot rely on the evidence in the first instance.

In this case, the "aggregate of facts" gave rise to more than a "mere suspicion" that the seized merchandise was related to unlawful activity, *i.e.,* counterfeiting of certification marks. *United States v. Padilla,* 888 F.2d 642, 643 (9th Cir.1989). The government therefore had probable cause to seize the packaged computer towers and the retail boxes.[5]

### VI.

The government is authorized under 19 U.S.C. section 1526(e) to seize imported merchandise of foreign manufacture if the merchandise bears a counterfeit certification mark. In the absence of the written consent of the owner of the mark, the government is then authorized to forfeit the offending merchandise. The ultimate disposition of properly seized and forfeited merchandise is left to the Secretary of the Treasury to determine.

In this case the government has established that the defendant merchandise is of foreign manufacture, bears a counterfeit certification mark, and was imported in violation of 15 U.S.C. section 1124. The government had probable cause to seize and forfeit the defendant merchandise under 19 U.S.C. § 1526(e).

For the reasons discussed above, summary judgment is GRANTED in favor of plaintiff and against defendants. Claimant's cross-motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

---

5. The disposition of the seized hard drives has already been resolved by joint stipulation of the parties.