# United States Court of Appeals for the Federal Circuit

2007-1518

VOLKSWAGEN OF AMERICA, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Thomas J. Kovarcik, of New York, New York, argued for plaintiff-appellant.

Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were Jeffrey S. Bucholtz, Acting Assistant Attorney General, and Jeanne E. Davidson, Director, of Washington, DC. Of counsel on the was Yelena Slepak, Office of Assistant Chief Counsel, International Trade Litigation, United States Bureau of Customs and Border Protection, of New York, New York.

Appealed from: United States Court of International Trade

Senior Judge Richard W. Goldberg

# United States Court of Appeals for the Federal Circuit

2007-1518

VOLKSWAGEN OF AMERICA, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in case no. 96-00132, Senior Judge Richard W. Goldberg.

_____

DECIDED:    August 22, 2008

_____

Before RADER, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.

DYK, Circuit Judge.

In this customs case, we again address issues concerning the allowance for merchandise alleged to be defective at the time of importation under 19 C.F.R. § 158.12. Plaintiff-Appellant Volkswagen of America, Inc. ("Volkswagen"), appeals from a final judgment of the United States Court of International Trade in favor of Defendant-Appellee United States ("the government"). The Court of International Trade held that: 1) it lacked jurisdiction over Volkswagen's claims with respect to repairs made after the protest date; 2) with respect to repairs made before the protest date to correct alleged manufacturing defects, Volkswagen's evidence failed to establish that the repairs

related to defects existing at the time of importation; and 3) with respect to repairs made before the protest date to correct design defects in response to government recall notices, Volkswagen failed to establish that it had contracted for merchandise free from design defects. Volkswagen of Am., Inc. v. United States, 484 F. Supp. 2d 1314 (Ct. Int'l Trade 2007).

We agree that the Court of International Trade lacked jurisdiction over Volkswagen's claims for repairs made after the date of its protest. With respect to claimed repairs not made in response to government recalls, we find that the Court of International Trade's conclusion that Volkswagen failed to establish by a preponderance of the evidence that those defects existed at the time of importation was not clearly erroneous. With respect to repairs made before Volkswagen's protest to comply with government recall notices, we find Volkswagen contracted for vehicles that were free from design defects. With respect to repairs made to comply with federal safety recall notices, we find that Volkswagen has established that the repairs were made to correct defects existing at the time of importation. With respect to repairs made to comply with other government-mandated recalls, we remand to the Court of International Trade for further proceedings. We also conclude that the Court of International Trade did not err in denying Volkswagen's motion for rehearing on its alternative theory for relief under 19 U.S.C. § 1401a ("maintenance expenses"), since Volkswagen did not properly assert the § 1401a claim below. We therefore affirm-in-part, reverse-in-part, and remand.


BACKGROUND

This case concerns claims for a reduction of the appraised value of imported merchandise as an allowance for repairs made to correct latent defects, pursuant to 19 C.F.R. § 158.12. That regulation provides in part:

> Allowance in value. Merchandise which is subject to ad valorem or compound duties and found by the port director to be partially damaged at the time of importation shall be appraised in its condition as imported, with an allowance made in the value to the extent of the damage.

19 C.F.R. § 158.12(a).

Volkswagen of America imported automobiles from two foreign manufacturers—Volkswagen AG, Volkswagen's parent company in Germany, and Audi AG—in 1994 and 1995. The imports constituted eighteen distinct Custom entries.[1] Pursuant to 19 U.S.C. § 1401a(b), Customs appraised the value of the imported vehicles based on the transaction value of the vehicles, that is, the price that Volkswagen actually paid for the goods at the time of importation. Customs liquidated (and assessed duties on) each of those entries according to the appraised value of the vehicles.

Subsequently, Volkswagen asserts that it determined that many of those vehicles contained manufacturing and design defects. Volkswagen claims that it repaired under warranty defects in those vehicles after they had been sold to the ultimate customer. The standard warranty clause provided that "[Volkswagen] warrants to the owner that the Contractual Product is free from defects in material and workmanship . . . ." J.A. at 102, 110. In turn, Volkswagen was reimbursed for the costs of the warranty repairs pursuant to the sales contract between it and the foreign manufacturers. The contract

---

[1] Volkswagen originally made claims on sixty-nine distinct entries, but later moved to sever and dismiss all but eighteen of those entries. Volkswagen of Am., Inc. v. United States, 277 F. Supp. 2d 1364, 1366 (Ct. Int'l Trade 2003).

provided that the "[foreign manufacturer] shall reimburse to [Volkswagen] the warranty costs it has expended pursuant to paragraph a) above [the agreement to warrant every product to the consumer], including recall costs (Appendix 7) and service action costs." J.A. at 99, 107.

Volkswagen filed with Customs several duty refund claims for an allowance on the appraised value of the imported vehicles equal to the warranty costs to repair the defective vehicles. Customs denied each of Volkswagen's claims. In response, from July 2, 1993, through November 13, 1995, Volkswagen submitted to Customs nineteen protests, contesting the denial of the claimed allowances. Customs denied each of Volkswagen's protests. Volkswagen then brought a civil action in the Court of International Trade pursuant to 28 U.S.C. § 1581(a) to contest Customs' denial of its protests.

Both Volkswagen and Customs moved for summary judgment. The Court of International Trade first determined that it lacked jurisdiction over claims that were based on repairs that occurred after Volkswagen filed its protests. Volkswagen of America, Inc. v. United States, 277 F. Supp. 2d 1364, 1369 (Ct. Int'l Trade 2003). With respect to repairs made before the dates of the protests, the Court of International Trade denied both Volkswagen's and Customs' motions for summary judgment, finding a genuine issue of material fact as to whether the defects at issue existed at importation. The Court of International Trade stayed further proceedings pending a decision by our Court in Saab Cars USA, Inc. v. United States, 434 F.3d 1359 (Fed. Cir. 2006).

We held in Saab that the Court of International Trade did not err in determining that the importer failed to establish by preponderant evidence that most of the warranty repairs that it submitted for an allowance existed at importation. Id. at 1374. The importer relied heavily on its warranty agreement and on a warranty repair spreadsheet detailing the various repairs to establish that it only made warranty repairs on, and was only reimbursed for, actual manufacturing defects. It also provided evidence that it employed a "rigorous system for tracking and auditing warranty repair claims." Id. at 1374. We found that "it is not clear that all warranty repairs necessarily indicate damage that existed 'at the time of importation,'" and that the warranty evidence alone was insufficient to support Saab's claim for repair costs. Id.

However, we found that the port repair expenses, that is, repairs made in the port at entry, were different because they were made "almost immediately after importation." Id. at 1364. We concluded that "the proximity of the port repairs to the time of importation, together with the other evidence provided by Saab, was sufficient to establish that the defects in question existed at the time of importation." Id. at 1374.

Following our decision in Saab, the Court of International Trade lifted its stay in this case. The court ordered Volkswagen to "file a brief addressing why it believes the evidence in this case . . . establishes that the alleged defects existed at the time of importation . . . ." J.A. at 5 n.2.

In response, Volkswagen submitted two exhibits detailing the repairs made to the vehicles in question and seeking to demonstrate that the vehicle warranty covered repairs made to correct manufacturing or design defects. Volkswagen asserted that it would only make repairs if such repairs were required by the vehicle warranty, and the

foreign manufacturer would only reimburse it for such repairs if they were made pursuant to the warranty.

The first, Exhibit A, included eighteen documents—one for each entry. Each document consisted of a chart, listing thousands of vehicle warranty repairs. Those charts provided eighteen separate columns of information regarding each repair. The repairs were organized by corresponding "factory model code" and VIN numbers (vehicle identification number). In addition to the identifying information, the chart provided descriptive information on the nature of the repair, such as a "damage code" and a "damage description." The chart also set forth the "vehicle mileage," the "in service date," and the "repair date." Finally, each repair included detailed cost information: "repair cost billable to factory," "qualifying warranty repair cost," "qualifying warranty overhead cost," and "total qualifying warranty cost." For those repairs that Volkswagen had determined were not covered under warranty, the corresponding "total qualifying warranty cost" was listed at $0.00. For example, two repairs—one for a battery testing (alleged to be a defect repaired under warranty) and one for a 7,500-mile maintenance (admitted not to be a defect repaired under warranty)—are shown below:

| A1 | A | B | C | D | D0 | D2 | D3 | E |
|---|---|---|---|---|---|---|---|---|
| Factory Model Code | VIN | Repair Order Number | Claim Type | Damage Code | Damage Desc | Vehicle Mileage | In Service Date | Repair Date |
| 3A56Q5 | WVWFE83AXSE203904 | 48140AC | W2 | 27T6660011 | battery testing at pre delivery greater then 12 3 volts | 3 | 6/16/1995 | 6/8/1995 |
| 3A56Q5 | WVWFE83AXSE203904 | 78872AC | FM | 0307110011 | 7,500 mile maintenance, incorrectly adjusted; repaired | 8,278 | 6/16/1995 | 11/1/1995 |

| F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|
| Dealer Repair Labor Amount | Dealer Repair Part Amount | "Other" Repair Costs/ (Credits) | Total VWoA Paid Amount | Adjustments | Repair Cost Billable To Factory | Qualifying Warranty Repair Cost | Qualifying Warranty Overhead Cost | Total Qualifying Warranty Cost |
| 11.80 | 0.00 | 0.00 | 11.80 | 0.00 | 11.80 | 11.80 | 0.09 | 11.89 |
| 28.80 | 20.29 | 0.00 | 49.09 | (5.27) | 43.82 | 0.00 | 0.00 | 0.00 |

The second exhibit, Exhibit B, purported to give more detailed information regarding each of the separate "claim types" listed in Exhibit A by listing each of the separate claim type codes along with a corresponding description of the claim type code. In addition, the claim type codes were separated into "included claim types" and "excluded claim types," the former being repair claims covered under Volkswagen's warranty, and the latter not being covered. Volkswagen did not submit any expert testimony explaining why these exhibits established that particular categories of repairs related to defects that existed at importation. However, the list of "included claim types" included repairs made pursuant to the requirements of government recall notices. These categories included: "Recall Campaign Claim" (including federal government safety recalls), "49 State Emissions Claim," "California Emissions Claim," "California Diesel Emissions Claim," and "FTC Claim."

For pre-protest repairs, the court issued a final decision without trial in favor of the government. With respect to repairs other than recall repairs, the court found Volkswagen's warranty agreement and exhibits were insufficient to establish that the repairs were made to correct defects existing at importation. With respect to repairs made to correct design defects in response to government mandated recalls, the court apparently concluded that, under the importation agreement, Volkswagen had ordered and imported vehicles containing design defects and could not claim the repair costs.

Volkswagen petitioned the court for rehearing, contending for the first time that the repairs constituted post-importation maintenance expenses, deductible under a separate provision, 19 U.S.C. § 1401a. The Court of International Trade denied Volkswagen's petition for rehearing, and Volkswagen timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the trial court's legal conclusions de novo; we review questions of fact for clear error. Saab, 434 F.3d at 1372. Volkswagen asserts that we may review de novo the Court of International Trade's determination that the evidence presented does not establish that the repairs were made on defects that existed at importation. However, these are determinations of fact that we cannot disturb unless we find them to be clearly erroneous.

## I

Volkswagen first contends that the Court of International Trade improperly held that it lacked jurisdiction with respect to repairs completed after Volkswagen's protests. The Court of International Trade has "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930." 28 U.S.C. § 1581(a) (2000). It has no jurisdiction, however, over an action based on an invalid protest. Saab, 434 F.3d at 1365. A valid protest "must set forth distinctly and specifically--(A) each decision described in subsection (a) of this section as to which protest is made; (B) each category of merchandise affected by each decision set forth under paragraph (1); (C) the nature of each objection and the reasons therefor; and (D) any other matter required by the Secretary by regulation." 19

U.S.C § 1514(c)(1). Similarly, Customs' regulations require a valid protest to contain "[a] specific description of the merchandise affected by the decision as to which protest is made" and "[t]he nature of, and justification for the objection set forth distinctly and specifically with respect to each . . . claim . . . ." 19 C.F.R. § 174.13(a)(5)-(6).

We have found that the statute and regulation require a valid protest to "'contain a distinct and clear specification of each substantive ground of objection' so as to 'show that the objection taken at the trial was at the time in the mind of the importer.'" Saab, 434 F.3d at 1367 (quoting Davies v. Arthur, 96 U.S. 148, 151 (1877)). A protest is "not akin to notice pleadings." Id. (emphasis and internal quotation marks omitted). Instead the protest must be "sufficient to notify the collector of its true nature and character, to the end that he might ascertain the precise facts, and have an opportunity to correct the mistake and cure the defect." Id.

In Saab, we rejected the argument that the Court of International Trade had jurisdiction over "cars to which no repairs had been made at the time of protest," finding that "[t]he regulation and statute, with their requirement that protests be set forth 'distinctly and specifically,' do not permit protests to proceed on such nebulous grounds." Id. Volkswagen attempts to distinguish Saab because Volkswagen is only claiming repairs made on vehicles that had already been included in its protest, while in Saab, the importer attempted to expand jurisdiction to vehicles not identified in the protest. In other words, Volkswagen argues that, for purposes of jurisdiction, it is sufficient to identify in a protest the vehicles for which an allowance is claimed in order to cover all subsequent repairs made to those vehicles.

We disagree. Repairs made subsequent to Volkswagen's protests were not "set forth distinctly and specifically" in the protests as required by 19 U.S.C § 1514(c)(1) and 19 C.F.R. §§ 174.13(5)-(6). Because those repairs were not properly described in a valid protest, the Court of International Trade is without jurisdiction over Volkswagen's claim for an allowance based on those repairs. We therefore conclude that the Court of International Trade correctly held that it lacks jurisdiction over alleged defects that were repaired after Volkswagen's protests.[2]

II

The Court of International Trade did, however, have jurisdiction over repairs made before the protest. Volkswagen claims that, with respect to such repairs, it is entitled to an allowance pursuant to 19 C.F.R. § 158.12 in the amount of the cost it incurred to repair latent defects. 19 C.F.R. § 158.12 provides:

> Merchandise which is subject to ad valorem or compound duties and found by the port director to be partially damaged at the time of importation shall be appraised in its condition as imported, with an allowance made in the value to the extent of the damage.

---

[2] Volkswagen also argues that a pre-importation estimate of warranty costs is sufficient. Again, we disagree. An estimate does not satisfy the requirement that the importer "set forth distinctly and specifically" each claim as required by the statute and the regulation.

In a related appeal, we held that 19 C.F.R. § 158.12 does not create a separate cause of action for an allowance on defective goods, and that the only cause of action for such an allowance must be made pursuant to the procedures set forth in 19 U.S.C. § 1514. Volkswagen of Am., Inc., v. United States, No. 2007-15, slip op. at 1-2 (Fed. Cir. July 16, 2008). Under § 1514, Volkswagen was required to file a protest within 90 days of importation. The effect is to leave Volkswagen with no ability to seek an allowance on latent defects discovered after 90 days from importation. The statute has since been amended to give importers 180 days to file a protest. 19 U.S.C. § 1514(c)(3), amended by Pub.L. 108-429, § 2103, Dec. 3, 2004.

We have held that this regulation "applies when the merchandise received is worth less than the merchandise that was ordered." Samsung Elecs. Am., Inc. v. United States, 106 F.3d 376, 378 (Fed. Cir. 1997). Merchandise containing latent defects is certainly worth less than the merchandise that was ordered. See id. at 380 ("[T]he goods Samsung imported contained latent manufacturing defects at the time of importation . . . [which were] worth less than defect-free goods.").

Surprisingly, the government argues that § 158.12 does not cover latent defects. It argues that "[w]hile some latent manufacturing defects may reflect 'damage' existing upon importation, not all such 'defects' automatically qualify as damage pursuant to 19 C.F.R. § 158.12." Appellee's Br. 25. That is, the government appears to argue that the cost of repairs is not a representative measure of damage, and that, therefore, Volkswagen has not shown that the repaired defects qualify as damage. We previously rejected this argument in Saab, where we held that "evidence of repair costs is a standard measure of diminution in value." 434 F.3d at 1375. Thus, we concluded that a latent manufacturing or design defect constitutes "damage" for purposes of the regulation, and that the cost of repairing those defects is a measure of the value of that damage.

We turn next to the central question on appeal: whether Volkswagen submitted evidence sufficient to establish that the repairs related to latent defects existed at the time of importation. The Court of International Trade correctly required Volkswagen to prove by a preponderance of the evidence that the claimed defects repaired under warranty existed at the time of importation and were not related to damage caused by

post-importation use.[3]  Id. at 1372-3.  The Court of International Trade, relying on our decision in Saab, concluded that "evidence of warranty claims alone is not sufficient without corroboration, even if the warranty only covers repairs for design and manufacturing defects."  J.A. at 17.

Volkswagen contends that the Court of International Trade imposed a special evidentiary requirement to introduce "corroboration" of its warranty claims by independent sources.  We agree that Saab does not impose a requirement that an importer provide corroboration evidence from a source other than the importer.  But we also do not read the Court of International Trade's decision as resting on any such theory.  Rather, we read the Court of International Trade's decision as resting on two propositions: first that evidence that repairs were made to satisfy warranty obligations standing alone is insufficient to establish that the repairs were made to correct manufacturing defects; and second, that repairs made to correct design defects in connection with government recall notices were not repairs mandated by the agreement between the importer and the manufacturer.

_____

[3]  Volkswagen contends that the Court of International Trade applied the wrong standard of proof.  Volkswagen argues that the Court of International Trade required it to prove by clear and convincing evidence, rather than by a preponderance of the evidence, that the defects existed at the time of importation.  See Fabil Mfg. Co. v. United States, 237 F.3d 1335, 1339 (Fed. Cir. 2001) (holding that the proper standard of proof is preponderance of the evidence).  Volkswagen's position is belied by the Court of International Trade's opinion itself, which expressly cites the correct standard: "[T]he Court is asked to determine . . . whether Volkswagen has put forth sufficient evidence to sustain its burden of proving by a preponderance of the evidence that certain defects existed in its merchandise at the time of importation."  J.A. at 10-11 (emphasis added).

We first address the alleged manufacturing defects. Volkswagen argues that the evidence that it approved a claim as a warranty repair and that the manufacturer reimbursed it for the cost of the repair is sufficient. Volkswagen relies heavily on its sales contracts with the foreign manufacturers that, by their very terms, appear only to cover latent defects. Those agreements set out that "[the foreign manufacturer] shall reimburse to [Volkswagen] the warranty costs it has expended," J.A. at 99, 107, pursuant to the standard warranty, which provides in part that "[Volkswagen] warrants to the owner that the Contractual Product is <u>free from defects in material and workmanship</u> . . . ." J.A. at 102, 110 (emphasis added). The sales contract between Volkswagen and its foreign manufacturers provides that the foreign manufacturers retain the "the right at any time to audit [Volkswagen's] implementation and administration of its warranties as previously approved by [the manufacturer]." J.A. at 100. Volkswagen implemented procedures for determining whether a particular repair is covered by the warranty. John Haynes, a Volkswagen employee, submitted an affidavit describing the warranty approval process in detail.[4]

---

[4]    Haynes stated:

Because not all claim-types qualify as warranty claims, [Volkswagen] uses claim-type codes for initial screening of the claim to determine liability and whether it is covered by new vehicle warranties. Claims submitted by a dealer that do not pass initial warranty coverage screening may be returned to the dealer for correction or reviewed by a claims adjuster in [Volkswagen's] Warranty Claims Department. If the information contained in the claim is sufficient for the WIN [warranty information network] system or the adjuster to determine warranty coverage, the claim is approved. If the information is insufficient, the WIN system or the adjuster requests additional information from the dealer, such as documentation or

The Court of International Trade rejected Volkswagen's argument that the evidence showing that the repairs were made under warranty established that the defects existed at importation. It stated: "[e]ven if these warranties make it clear that Volkswagen would be reimbursed by the manufacturer only for actual manufacturing or design defects in the imported automobiles, still 'it is not clear that all warranty repairs necessarily indicate damage that existed at the time of importation as required for an allowance under § 158.12.'" J.A. at 17 (quoting Saab, 434 F.3d at 1374). We see no basis for overturning the decision of the Court of International Trade. Virtually the same arguments were rejected in Saab.

As noted earlier, in Saab, we distinguished between Saab's two claims—port repair expense claims and later warranty expense claims involving repairs to vehicles delivered to the ultimate purchasers. The proximity of the port repairs to the time of importation, we concluded, "provided critically probative evidence that the defects in question actually existed at importation." Id. at 1373. The absence of evidence linking the warranty repairs to defects existing at the time of importation, on the other hand, was fatal to Saab's warranty repair claim. We found that "it is not clear that all warranty repairs necessarily indicate damage that existed 'at the time of importation,' as required for an allowance . . . ." Id. at 1374. We noted, for example, "that the perforation warranty applies to body rust that occurs 'during the course of normal usage.'" Id. We

---

submission of the vehicle part claimed to be defective. If the adjuster determines that the information submitted does not support the claim, he denies the claim. Approved claims are processed forthwith for payment. Denied claims may be appealed. If upheld on appeal, denied claims are "written off" by the dealer.

J.A. at 77.

also found it plausible that the warranty agreement would cover optional equipment installed by the dealer. Thus, we found that, although "some repairs authorized under the various warranties may relate to damage that existed at the time of importation, they do not necessarily so relate." Id. We held that Saab's evidence was not sufficient to prove by a preponderance of the evidence that its warranty repair claims existed at the time of importation.

Here, as in Saab, the mere existence of the warranty agreements is insufficient. While the optional equipment problem identified in Saab appears not to be present here, the situation is otherwise similar. Under the agreements, repairs made to correct defects resulting from mishandling during transit from the point of entry to the dealer's lot would appear to be covered by warranty as would repairs of damage to vehicles occurring in the dealer lot. The agreements do not rule out the possibility that Volkswagen made warranty repairs in order to create consumer goodwill, even where the defect is not covered under warranty. The mere fact that the repair is covered by warranty is insufficient to establish that the repair related to a defect existing at the time of importation.

Volkswagen urges that, even if the warranty agreements are insufficient, the detailed description of each repair made under warranty provides sufficient proof that those repairs were made to correct manufacturing defects. According to Volkswagen, it is this detailed description which distinguishes its case from the warranty evidence found insufficient in Saab.

The Court of International Trade rejected Volkswagen's contention that the brief descriptions of each repair sufficed: "[t]he short descriptions in Exhibit A provide slightly

more detail than Saab's brief descriptions of repaired parts; however . . . they are still insufficient to make a § 158.12 claim." J.A. at 18. We find no error in the Court of International Trade's factual finding. The government correctly points out that it may well be that some of these discovered defects did not exist at the time of importation. For example, Exhibit A provides the following description of one of the warranty repairs: "windshield washer container; leaking, replaced." J.A. at 84. Although it is possible that the windshield washer container was leaking at the time it was imported, it is equally possible that the container was damaged in transit from the point of entry or while in the dealer's lot. Without more, we cannot conclude from the mere fact that Volkswagen made a determination that the repair was covered under its warranty that the alleged defect existed at importation. Indeed, Volkswagen presented no evidence that it determines (or how it determines) whether a particular vehicle presented for repair has a defect that existed at the time of importation.

To be sure, some repairs may have been made to correct defects that did exist at the time of importation. For example, a repair described as "ignition lock cylinder/key; mechanical defect, replaced" is one that is likely a manufacturing defect. J.A. at 85. But, with the exception of the government recalls discussed below, Volkswagen relied solely on the written documents and a "categorical approach." J.A. at 21. It did not attempt to distinguish between different categories of warranty repairs or present any expert testimony that certain categories of repairs would be more likely than not to be made on defects that existed at the time of importation and not due to damage occurring after importation of those vehicles.

We conclude that the Court of International Trade did not err in concluding that Volkswagen's warranty evidence was insufficient to prove by a preponderance of the evidence that the warranty repair claims for alleged manufacturing defects existed at the time of importation.[5]

B

We turn next to the category of warranty repairs made in response to government-mandated recalls. Volkswagen contends that the repairs that it was required to make pursuant to government-mandated recalls by definition were made only to correct design defects and were not made to correct post-importation damage. Volkswagen argues that Exhibit A, which specifies the claimed repairs that were made pursuant to recalls, establishes that the recall repairs were made on latent defects.

The government argues that the Court of International Trade properly held that such design defects do not qualify because the vehicles were "manufactured exactly as to the construction specifications requested by Volkswagen." J.A. at 17 n.10. In other words, the government argues that Volkswagen contracted to buy vehicles that were defective by government standards or non-compliant with government safety regulations.

The Court of International Trade appeared to agree with the government, drawing a distinction between manufacturing defects and design defects. With respect

---

[5]    Volkswagen also appears to argue that the repairs identified as being made before the in-service date are similar to the port repairs held in <u>Saab</u> to be sufficient, given their close proximity to the importation date. We reject this argument. There is no indication that in-service repairs are made almost immediately after importation, as are the port repairs. Absent that critical fact, we cannot say that the in-service repairs are sufficient.

to manufacturing defects, the Court of International Trade found that "Volkswagen has already successfully established that it contracted for 'defect-free' merchandise." J.A. at 13 n.7. On the other hand, the Court of International Trade found that Volkswagen did contract for merchandise having design defects in holding that Volkswagen's safety recall repairs did not qualify. With respect to recall repairs, the Court of International Trade concluded that:

> [R]ecall repairs are not 'by definition' repairs of damage that existed at importation, because when the vehicle was ordered and imported, it may have been manufactured exactly to the construction specifications requested by Volkswagen. If this is the case, the vehicle was not damaged at the time of importation. Thus, the Court cannot conclude simply from the evidence before it that repairs done pursuant to a recall constitute evidence of damage that existed at the time of importation.

J.A. at 17 n.10 (emphasis added). The Court of International Trade thus appeared to agree with the government that Volkswagen ordered and imported vehicles containing design defects. We review the interpretation of a contract—a question of law—without deference. Nilssen v. Osram Sylvania, Inc., 504 F.3d 1223, 1231 (Fed. Cir. 2007).

In Samsung, we found that the district court improperly interpreted the sales contract as an agreement that the buyer ordered both defect-free and defective merchandise. 106 F.3d at 380. We recognized that "Samsung paid for defect-free merchandise, and that is, through reimbursement, what Samsung effectively received." Id. We did not make the distinction between manufacturing defects and design defects in Samsung that the Court of International Trade made here.

We conclude that the Court of International Trade wrongly interpreted the importation sales agreements in finding that Volkswagen contracted to buy vehicles with design defects. With respect to the manufacturers' contractual obligations, the

contracts do not distinguish between manufacturing defects and design defects. Volkswagen ordered and paid for defect-free vehicles—defects that were either design defects or manufacturing defects. We therefore reject the government's argument that Volkswagen contracted to import vehicles with design defects, and hold that the Court of International Trade erred in holding that design defects were not covered.

Absent the contractual theory that Volkswagen sought and paid for defective vehicles, the government does not suggest that the evidence of a government ordered recall is not sufficient to establish that the defect existed at the time of importation.

Indeed, the statute suggests that U.S. government ordered safety recalls only cover defects that existed at the time of importation. 49 U.S.C. § 30112(a) prohibits the importation of vehicles that do not comply with applicable safety standards set by the National Highway Traffic Safety Administration. Accordingly, any imported vehicle must be certified to be in compliance with all safety standards and regulations in effect at the time of importation. See 49 U.S.C. § 30115.

The enforcement provisions of the motor vehicle safety statute require a manufacturer of the defective equipment to remedy the defect or the noncompliance without charge. Id. § 30116. A "manufacturer" is defined to include one who "import[s] motor vehicles" for resale. Id. § 30102. Thus, the statute is written to remedy design defects involving the failure to comply with government mandated safety statutes— defects that existed at the time the vehicle was imported into the United States.

This category of claims is similar to the "port repair" claims at issue in Saab. There, we explained that evidence identifying such "port repair" claims—defined as repairs made almost immediately after importation—sufficiently established that the

repaired defects existed at the time of importation, given "the proximity of the port repairs to the time of importation." Saab, 434 F.3d at 1374. Similarly, the very nature of a government mandated safety recall establishes the high likelihood that any defects repaired pursuant to the recall existed at the time of importation.

In addition to the federal law safety recalls, Volkswagen's warranty repairs included repairs made pursuant to state law emissions recalls, including, for example, categories of "49 state emissions claim," "California emissions claim," and "California Diesel Emissions claim." J.A. at 89. It also included a claim for "FTC claim[s]"—a category that the parties have not explained. Id. The parties have not briefed whether these state recalls and the FTC recall also relate to latent defects existing at the time of importation. We do not decide whether the circumstances of the state law recalls and the FTC recall exhibit the same reliability that the subject defects existed at the time of importation into the United States. We therefore remand to the Court of International Trade to determine in the first instance whether those recalls are more likely than not concerned with latent defects present in vehicles at the time of importation.

III

Volkswagen alternatively asserts that it is entitled to an exclusion from the entered value of the imported vehicles, pursuant to 19 U.S.C. § 1401a(b)(3)(A)(i). That statute provides:

> The transaction value of imported merchandise does not include any of the following, if identified separately from the price actually paid or payable and from any cost or other item referred to in paragraph (1):
>
> (A) Any reasonable cost or charge that is incurred for—

> (i) the construction, erection, assembly, or <u>maintenance of</u>, or the technical assistance provided with respect to, the merchandise after its importation into the United States;

19 U.S.C. § 1401a(b)(3) (emphasis added). Volkswagen maintains that its warranty repairs constitute post-importation "maintenance" that should be deducted from the dutiable value of the imported vehicles. Volkswagen did not assert this claim before the Court of International Trade, and the Court of International Trade did not initially address the claim. Instead, Volkswagen first asserted that claim to the Court of International Trade in its motion for rehearing. The Court of International Trade denied Volkswagen's motion and refused to consider Volkswagen's alternative theory that it is entitled to an exclusion under § 1401a.

On appeal, the government maintains that the § 1401a exclusion claim was not properly asserted below, and therefore is not properly before this court on appeal. We agree. Although it is clear that Volkswagen did assert a § 1401a(b)(3)(A)(i) claim in its protest to Customs, it did not assert that claim in the civil action it filed at the Court of International Trade. Nowhere in its complaint to that court does Volkswagen refer to a claim that its warranty repairs constitute maintenance costs under § 1401a(b)(3)(A)(i). Volkswagen does not dispute this procedural history, but rather asserts that our earlier decision in <u>Samsung</u> precluded it from pleading this alternative claim for relief. Volkswagen urges that it was required to proceed first with its § 158.12 allowance claim and then, only after its § 158.12 claim was rejected, could it have moved forward with its § 1401a claim. Volkswagen's argument is without merit. Nothing in <u>Samsung</u> suggests any such requirement. We conclude that Volkswagen's § 1401a maintenance claim was not properly raised below and has therefore been waived.

CONCLUSION

We therefore affirm-in-part, reverse-in-part, and remand for further proceedings consistent with this opinion.

AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED

No costs.