In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4080

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

4500 AUDEK MODEL NUMBER 5601
AM/FM CLOCK RADIOS,

Defendant,

and

ABBEY MANUFACTURING COMPANY,

Claimant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 8047--John F. Grady, Judge.


Argued May 11, 2000--Decided July 17, 2000




   Before COFFEY, EVANS and WILLIAMS, Circuit Judges.

   COFFEY, Circuit Judge.  On February 28, 1998, the
United States Customs Service in Chicago,
Illinois, seized 4500 clock radios from Abbey
Manufacturing Company on the grounds that the
radios contained counterfeit Underwriters
Laboratories Certification Marks attached
thereto. See 19 U.S.C. sec.sec. 1526(e) &
1595a(c)(2)(C); 15 U.S.C. sec. 1127. This appeal
involves Abbey's attempt to regain possession of
the 4500 clock radios. We affirm.

I.   BACKGROUND
A.   The Parties

   Abbey Manufacturing Company has been engaged in
the manufacture of OEM plastic injection molding
since 1989./1 In an effort to enter the
electronics market, Abbey created a wholly owned
subsidiary known as Audek Corporation in 1993 to
develop a domestic clock radio manufacturing
operation.

Underwriters Laboratories (UL), in Northbrook, Illinois, is a not-for-profit testing laboratory that examines and tests numerous products, including clock radios. Manufacturers submit samples of their products to UL for examination and testing so that UL may independently determine if the products meet specific standards and requirements for fire, electrical, and casualty hazards. If the product meets UL's standards, the manufacturer and UL enter into a "follow-up services agreement,"/2 and, at this point, manufacturers may attach UL's certification mark to their product. The agreement provides that UL's mark may only be used: 1) in connection with the covered product; 2) by the manufacturer named in the Procedure; and 3) at the location of the manufacture or assembly specified in the Procedure.

UL then prepares a document called a "Procedure." The Procedure identifies and describes which products meet UL's safety standards and may therefore use the UL certification mark; specifies the type of mark to be used; denotes the manufacturer who may use UL's mark; and delineates the factory location at which covered products bearing UL's mark may be manufactured./3

B.  The Agreement

On July 25, 1994, Audek and UL entered into a follow-up services agreement in which Audek sought approval to affix UL's mark on its clock radios. After UL tested samples of the clock radios, it agreed to approve Audek's request, and Audek commenced manufacturing radios with UL's mark./4

Pursuant to the agreement between Audek and UL, a Procedure was agreed upon and approved whereby Audek was allowed to affix UL's mark to radios manufactured in China. However, Audek arranged and paid for UL inspections of the clock radios manufactured in the plant in China. Furthermore, Audek also paid UL to list the factory in China in the Procedure as an authorized manufacturing location.

In November 1996, Audek notified UL that it would no longer be manufacturing radios in China and that "all future production" would be completed "at 2140 West Fulton Street, Chicago." The notice also advised UL that "[a]ny future inspections need to be conducted at [the Fulton Street] location." Based on Audek's representation, the Procedure was modified to eliminate references to the manufacturing facility in China, and UL ceased their periodic inspections of clock radios manufactured at the Chinese factory by the end of 1996. Since that

time, neither Audek nor Abbey has paid UL for the testing, listing, or inspection of any clock radios manufactured in China.

In December 1996, Abbey notified UL that, as of January 1, 1997, Audek was being eliminated as a corporate entity and all future business would be done by Abbey. Accordingly, Abbey and UL entered into a follow-up services agreement dealing with Abbey's rights to affix UL's mark on its clock radios. The agreement stated that, "[e]xcept where otherwise specifically authorized, the [UL] mark shall be applied to or used in connection with the covered product only by the Manufacturer named in the Procedure and only at the location of manufacture or assembly specified in the Procedure."

The only manufacturing location listed on the January 15, 1997 Procedure (between Abbey and UL) was 2140 West Fulton Street, Chicago, Illinois. Furthermore, the Procedure authorized the use of UL's mark "only at the above manufacturing location on such products which comply with this Procedure and any other applicable requirements."

C.  The Radios from China

In February 1998, Abbey attempted to import 4500 clock radios into the United States, bearing UL's mark, which it had assembled in China. However, the United States Customs Service in Chicago, Illinois, seized the clock radios and contacted UL to determine if the UL certification mark displayed on the clock radios was authorized.

After Customs notified UL that the radios had been seized, UL wrote to Abbey and requested an explanation as to why it was still importing radios manufactured in China with UL's mark despite the fact that Abbey was now only authorized to manufacture radios bearing the UL mark in Chicago, Illinois. Abbey responded by claiming that in October of 1996, Mark Harkowski, an associate project engineer with UL, advised Audek that "in order to move the inspection location" for the clock radios to Chicago, "it would be necessary to provide the UL inspector with copies of invoices showing that UL approved parts were purchased for these radios by the manufacturer."/5 Because, under the terms of the January 15, 1997 agreement with UL, Abbey was no longer authorized to manufacture clock radios in China for importation into the United States, UL informed Customs that Abbey's attempt to import the 4500 radios was unauthorized. After receiving this information, the government commenced forfeiture proceedings on the 4500 clock radios in their possession.

D.  The District Court

  Upon completion of discovery, the government moved for summary judgment, arguing that the undisputed facts demonstrated that UL had not authorized the use of its mark on the seized radios. According to the district judge,

[i]t is undisputed that the Procedure issued to Audek did not allow Audek (or Abbey) to use the UL mark in conjunction with any products manufactured outside of the United States. This exclusion comports with the agreement's stated rationale that UL would only authorize its mark to be used on goods manufactured at factories subject to its inspection. Because Abbey (and previously, Audek) did not pay UL for inspections of its factories in China during the time defendant radios were manufactured, UL did not inspect the factories, or the products manufactured there. Accordingly, by the terms of the agreement, any radios manufactured in China after the Procedure was issued should not have borne the UL mark.

The court also rejected, under the parol evidence rule, Abbey's argument that it had authorization from UL to manufacture the radios in China via Harkowski's alleged statement in 1996. The judge granted the government's motion for summary judgment, and ordered the forfeiture of the 4500 clock radios. Abbey appeals.

II.  ISSUES

  On appeal, Abbey argues that the trial judge erroneously granted summary judgment because the agreement between it and UL was ambiguous under Illinois law and therefore the judge should have permitted the introduction of extrinsic evidence, namely Harkowski's alleged, oral 1996 authorization to import clock radios from China bearing UL's mark in 1998.

III.  ANALYSIS

  As this case is governed by Illinois law, we initially determine whether the contract is ambiguous. See Echo, Inc. v. Whitson Co., Inc., 52 F.3d 702, 705 (7th Cir. 1995) (citing Metalex Corp. v. Uniden Corp. of America, 863 F.2d 1331, 1333 (7th Cir. 1988)). If the court determines that the contract is unambiguous, there is no issue of material fact and the court must decide the contract's meaning as a matter of law. See id. And, as we have repeatedly stated, contract interpretation is particularly suited to disposition by summary judgment, a decision we review de novo. See Echo, Inc. v. Whitson Co.,

Inc., 121 F.3d 1099, 1102 (7th Cir. 1997) (citing Malcak v. Weschester Park Dist., 754 F.2d 239, 243 (7th Cir. 1985))./6

In this case, the agreement reached between Abbey and UL authorized Abbey to use UL's mark under only two circumstances: 1) according to the specifications of a Procedure issued by UL; or 2) where "otherwise specifically authorized."

It is undisputed that after Audek informed UL that it would no longer be producing radios in China, the amended Procedure eliminated China as an authorized location for radio production./7 It is, therefore, also undisputed that the amended Procedure issued to Audek did not allow either Audek or Abbey to use UL's mark in conjunction with any products manufactured outside of Chicago, Illinois./8 Accordingly, the follow-up services agreement between Abbey and UL, in terms of expressly authorizing the production of clock radios in China, is clear and unambiguous, and any radios assembled in China after the revised Procedure between Audek and UL was issued in 1996 should not have contained the UL mark.

However, Abbey contends that it was "otherwise specifically authorized" to use the UL mark on the radios./9 Abbey argues that its conversation with Harkowski constitutes such authorization. Even if we were to accept Abbey's account of the conversation as accurate, Harkowski's statement cannot be construed as specific authorization for Abbey to produce clock radios in China bearing the UL mark. Rather, Harkowski merely stated that "in order to move the inspection site for these radios to Abbey Manufacturing Company's Fulton Street facility, it would be necessary to provide the Underwriters Laboratories inspector with copies of invoices showing that Underwriters Laboratories approved parts had been purchased for and used in the radios by the manufacturer." This alleged statement merely concerned part of the necessary process for moving the manufacturing location from China to Chicago, Illinois, and cannot be considered any form of specific authorization to import clock radios from China into the United States with the UL mark attached. Rather, it was an oral statement made by an associate project engineer, sixteen months before the attempted importation of the radios, and at a time when Audek was still paying UL for inspection of clock radios manufactured at the China facility.

The decision of the district court is

AFFIRMED.

/1 A plastic injection molding machine makes parts, and when they come out, assembly workers trim away the extra plastic and join the pieces or parts into one unit.

/2 A follow-up services agreement is merely a contract between UL and a manufacturer which permits the manufacturer to affix UL's certification mark on approved products.

/3 The follow-up services agreement and the subsequent Procedure form the contract between UL and the manufacturer.

/4 Because the terms are used interchangeably, it is unclear from the record whether Abbey/Audek actually manufactured or merely assembled the clock radios in China. Consequently, the opinion refers to both the assembling and manufacturing of clock radios without any intent to infer different actions on the part of Abbey/ Audek or UL.

/5 According to Harkowski's affidavit, however, he has "never informed anyone that the UL Mark could be used on a product except as specified in the Procedure covering such product, nor would [he] have the authority to make such a representation on UL's behalf."

/6 According to National Diamond Syndicates, Inc. v. United Parcel Serv., Inc., 897 F.2d 253, 256 (7th Cir. 1990) (footnote omitted):

Under Illinois law, if a contract is "in writing, is unambiguous and contains no uncertain terms, interpretation of the contract is a question of law for the court," Nerone v. Boehler, 34 Ill. App.3d 888, 890-91, 340 N.E.2d 534, 536 (5th Dist. 1976), and no evidence outside the four corners of the contract may be employed to construe its terms. A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp., 132 Ill. App.3d 325, 329, 87 Ill. Dec. 429, 432, 477 N.E.2d 30, 33 (1st Dist. 1985). Whether a contract is ambiguous is a question of law, and "ambiguity can be found only if the language [of the contract] is reasonably or fairly susceptible of more than one construction." Id., 132 Ill. App.3d at 328, 87 Ill. Dec. at 432, 477 N.E.2d at 33; accord W.H. Lyman Constr. Co. v. Village of Gurnee, 131 Ill. App.3d 87, 96, 86 Ill. Dec. 276, 283, 475 N.E.2d 273, 280 (2d Dist. 1985); see also Fields v. Franklin Life Ins. Co., 115 Ill. App.3d 954, 958, 71 Ill. Dec. 776, 778, 451 N.E.2d 930, 932 (5th Dist. 1983) (ambiguity in meaning of contract may be created by language used, or by some disputed extrinsic facts, such as peculiar meaning attached to words by parties).

But see Home Ins. Co. v. Chicago and Northwestern Transp. Co., 56 F.3d 763, 767-68 (7th Cir. 1995).

/7 Although Abbey claims to not have received the Procedure UL produced after UL was informed that Abbey would be taking over operations for Audek (the government did produce the Procedure), it is of no consequence because it is undisputed that Audek received the amended Procedure after it informed UL that it would not be manufacturing radios in China. Furthermore, Abbey does not claim that the Procedure did list or should have listed China as an authorized manufacturing site.

/8 We agree with the district judge's statement that:

This exclusion comports with the agreement's stated rationale that UL would only authorize its mark to be used on goods manufactured at factories subject to its inspection. Because Abbey (and previously, Audek) did not pay UL for inspections of its factories in China during the time defendant radios were manufactured, UL did not inspect the factories, or the products manufactured there.

/9 Although we are of the opinion that the district judge correctly determined that the contract was unambiguous, we add the following to demonstrate that even if the parol evidence rule was inapplicable, the district court's decision was still correct.