# United States Court of Appeals
# for the Federal Circuit

---

**ICCS USA CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-1561

---

Appeal from the United States Court of International Trade in No. 1:17-cv-00108-MAB, Judge Mark A. Barnett.

---

Decided: March 11, 2020

---

ELON ABRAM POLLACK, Stein Shostak Shostak Pollack & O'Hara, Los Angeles, CA, argued for plaintiff-appellant. Also represented by MATTHEW ROSS LEVITON.

JAMIE SHOOKMAN, International Trade Field Office, Commercial Litigation Branch, Civil Division, New York, NY, argued for defendant-appellee. Also represented by AMY RUBIN, HARDEEP KAUR JOSAN; JEANNE DAVIDSON, JOSEPH H. HUNT, Washington, DC; YELENA SLEPAK, Office of the Assistant Chief Counsel, United States Department of Homeland Security, United States Bureau of Customs and Border Protection, New York, NY.

---

Before NEWMAN, MOORE, and CHEN, *Circuit Judges.*

CHEN, *Circuit Judge.*

ICCS USA Corporation (ICCS) appeals from the United States Court of International Trade's grant of summary judgment in favor of the government ruling that United States Customs and Border Protection (Customs) lawfully issued to ICCS a notice to redeliver merchandise that violated 19 U.S.C. § 1526(e) by displaying a counterfeit certification mark. *ICCS USA Corp. v. United States*, 357 F. Supp. 3d 1314 (Ct. Int'l Trade 2018). For the reasons set forth below, we affirm.

BACKGROUND

I. Facts

On January 19, 2017, ICCS imported 56,616 individual butane gas canisters into the United States that displayed a "PREMIUM" brand label affixed on the outside of the canisters. At the time of importation, the PREMIUM model canisters displayed a registered certification mark owned by Underwriters Laboratories Inc. (UL). Customs subsequently determined that the canisters were "counterfeit" in that they made unauthorized use of the UL certification mark. On February 23, 2017, Customs issued a notice ordering ICCS to redeliver the imported canisters to Customs' custody pursuant to § 1526(e). ICCS redelivered only 29,008 of the 56,616 canisters to Customs for seizure. Customs issued a Notice of Penalty or Liquidated Damages Incurred and Demand for Payment to ICCS with respect to the 27,608 non-delivered canisters, and assessed damages against ICCS in the amount of $41,412.00. This appeal concerns Customs' demand for redelivery with respect to

the 27,608 canisters that were not seized by Customs.[1] *See ICCS*, 357 F. Supp. 3d at 1319.

UL is an independent, not-for-profit laboratory that tests various products for compliance with nationally recognized safety standards and requirements. *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1328–29 (Fed. Cir. 2006); *United States v. 10,510 Packaged Computer Towers, More or Less* (*Computer Towers*), 152 F. Supp. 2d 1189, 1191 (N.D. Cal. 2001). "Manufacturers submit samples of their products to UL for examination and testing so that UL may independently determine if the products meet specific standards and requirements for fire, electrical, and casualty hazards." *United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios* (*Audek Model Clock Radios*), 220 F.3d 539, 540–41 (7th Cir. 2000) (detailing UL's requirements for labeling a product with UL's certification mark). If, and when, UL finds that a manufacturer's products comply with applicable standards, UL authorizes the manufacturer to affix UL's certification mark to the products. *Acadia Tech.*, 458 F.3d at 1329. When consumers see UL's certification mark displayed on products, the UL mark informs consumers that they are purchasing products that have UL's "seal of approval" and comply with UL's safety standards and requirements. 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:91 (5th ed. 2019) (McCarthy on Trademarks).

ICCS is the U.S. affiliate of One Jung Can Mtf. Co. Ltd. (OJC), and ICCS imports butane gas canisters manufactured by OJC. J.A. 64. ICCS's PREMIUM model canister

---

[1]  The Court of International Trade lacks jurisdiction under 28 U.S.C. § 1581(a) to review a seizure of merchandise by Customs. *H & H Wholesale Servs., Inc. v. United States*, 437 F. Supp. 2d 1335, 1340 (Ct. Int'l Trade 2006). Pursuant to 28 U.S.C. § 1356, jurisdiction over seized merchandise lies with the district court.

is a model of OJC's MEGA-1 butane gas canister.[2]  UL certified the MEGA-1 canister for OJC in October 2001 after testing it for safety.  J.A. 236–46.  But as of January 19, 2017 (the date of entry), ICCS's PREMIUM model canister had not been certified.

ICCS's contractual relationship with UL began in October 2015, when ICCS and OJC entered into a Multiple Listing Services Agreement with UL.  J.A. 185, 187.  UL's multiple listing services allow an authorized manufacturer (which in this case is OJC) to brand and label its products using the multiple listee's name (here, ICCS) so that the products certified by UL for OJC can be marketed by ICCS.  J.A. 262; *see ICCS*, 357 F. Supp. 3d at 1317.  The contract, made pursuant to the Multiple Listing Services Agreement, was comprised of two documents: the Multiple Listing, Recognition, Verification, and Classification Services Service Terms (the Service Terms) and the Global Services Agreement.  *ICCS*, 357 F. Supp. 3d at 1317.  Under the Service Terms ¶ 1, the "basic product," which refers to OJC's MEGA-1 canister, was authorized to display UL's certification mark when "marked with [ICCS's brand] label instead of [OJC's brand] label."  J.A. 262; *ICCS*, 357 F. Supp. 3d at 1323 n.18.

The Service Terms authorized ICCS to display UL's certification mark on any ICCS "models" that are the same

---

[2]    At oral argument, counsel for ICCS insisted that PREMIUM and US BUTANE (another type of ICCS's butane gas canister) are not "models."  Oral Arg. at 2:00–2:50, 35:40–36:20, *ICCS USA Corp. v. United States*, No. 2019-1561 (Fed. Cir. Dec. 16, 2019), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2019-1561.mp3. Yet, the correspondence between ICCS, OJC, and UL, in addition to UL's online directory, consistently refer to PREMIUM and US BUTANE as "M[ultiple ]L[isting] *model[s]*."  J.A. 272–75, 376, 378 (emphasis added).

physical product as OJC's MEGA-1 canister, but only after UL verifies that any differences between ICCS's model and the MEGA-1 "basic product" are merely "superficial." *See* J.A. 264. In other words, as the Court of International Trade observed, new ICCS models can become authorized to display UL's certification mark, but *only after* ICCS makes a request and UL expressly approves ICCS's request. *ICCS*, 357 F. Supp. 3d at 1324 (citing J.A. 263–64). UL maintained a list of authorized models for the public on its Online Certifications Directory. *Id*. at 1317; *see* J.A. 376, 378.

The ICCS models of butane gas canisters at issue in this case are the PREMIUM model and the US BUTANE model. While the PREMIUM model displayed a "PREMIUM" brand label, ICCS's US BUTANE model displayed a "US BUTANE" brand label affixed on the outside of the canisters. Oral Arg. at 20:00–20:40. Between October 2015 and February 2017, including on the date of entry (January 19, 2017), only the US BUTANE model was listed on UL's Online Certifications Directory under ICCS's name. J.A. 376. The PREMIUM model was not listed, and not authorized by UL to display the certification mark, until February 8, 2017. J.A. 378. This is because ICCS did not make a request for UL to add the PREMIUM model to UL's multiple listing services until *after* the date of entry of the PREMIUM model canisters. Upon receiving that request, UL approved it and updated its online directory to include the PREMIUM model.

When Customs learned that, at the time of entry, UL had not authorized the use of its certification mark on the PREMIUM model, Customs issued to ICCS the notice to redeliver the 56,616 PREMIUM model canisters, stating that ICCS was in violation of § 1526(e). J.A. 381–82. ICCS redelivered 29,008 of the 56,616 canisters, but failed to redeliver the remaining 27,608 canisters, presumably because they had already entered the stream of commerce. Appellee's Br. at 5.

## II. Proceedings Below

On April 6, 2017, ICCS filed the protest that underlies this action, challenging Customs' demand for redelivery. J.A. 279–90; 19 U.S.C. § 1514(a)(4) (allowing importers to protest decisions by Customs as to, *inter alia*, "a demand for redelivery to customs custody under any provision of the customs laws"). ICCS claimed that the redelivery notice was unlawful because ICCS had a valid license with UL to display the UL certification mark on the PREMIUM model canisters. Customs then contacted UL to inquire about ICCS's protest, and UL confirmed that, on the date of entry, the PREMIUM model canisters "were not . . . authorized to display the UL Listing Certification Marks." J.A. 292–93. Customs subsequently denied ICCS's protest, and this action commenced, pursuant to 28 U.S.C. § 1581(a), in the Court of International Trade.

ICCS filed a complaint in the Court of International Trade on May 11, 2017, challenging Customs' denial of ICCS's protest of Customs' demand for redelivery. Customs communicated to ICCS that it would "stipulate this case if [ICCS] can provide a letter from UL stating that UL does not object to the retroactive use of its mark on 'PREMIUM' model[] [canisters] . . . at issue in this case." J.A. 408. ICCS's counsel attempted to obtain such a letter from UL, and the government requested an extension of time for ICCS's counsel to do so. J.A. 407–08.

However, UL would not consent to the retroactive use of its certification mark. J.A. 395–98. In correspondence with ICCS's counsel, UL's representative stated, "UL certifications are not retroactive," and therefore, the merchandise at issue "were not then and are still not authorized to display the UL certification marks." J.A. 396. "UL upholds a strict zero-tolerance policy . . . [which] is uniformly applied and is considered reasonable and necessary in order to protect the integrity of UL's [r]egistered [m]arks." *Id.* UL denied ICCS's request "for a waiver" because that

"would allow other companies to copy the UL Mark with impunity, safe in the knowledge that if the merchandise is intercepted at U.S. Customs, that the investment could still be salvaged." J.A. 397.

On cross-motions for summary judgment, the Court of International Trade upheld Customs' determination that the UL certification mark displayed on ICCS's merchandise was counterfeit. *ICCS*, 357 F. Supp. 3d at 1316. The court concluded, based on the Service Terms and the Global Services Agreement, that ICCS must obtain "express authorization" from UL for each model of butane gas canister *prior to* using UL's certification mark on that model. *Id.* at 1324. Based on the Service Terms ¶¶ 2, 4(b), 6(a), and 7, the court concluded that new models can be added to UL's multiple listing services *only after* ICCS makes a request to UL and UL determines that the new model is eligible because any differences between the new model and the MEGA-1 basic product are merely "superficial." *Id.* Further, both the Service Terms ¶ 8 and the Global Services Agreement ¶ 8 expressly forbid ICCS from using UL's certification mark "on any goods or their containers or packaging," "[e]xcept as otherwise expressly authorized." *Id.* The court thus concluded that ICCS's PREMIUM model canisters were counterfeit because "ICCS did not have express authorization to display UL's certification mark on the PREMIUM model on the date of importation, and because UL's authorization that occurred after the date of importation was not retroactive." *Id.* ICCS appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### I. Counterfeit Certification Mark

In the Court of International Trade, summary judgment is available when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Ct. Int'l Trade R. 56(a). "We review the [Court of International Trade's]

grant of summary judgment without deference." *Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374, 1377 (Fed. Cir. 2019). "We review the trial court's legal conclusions de novo; we review questions of fact for clear error." *Volkswagen of Am., Inc. v. United States*, 540 F.3d 1324, 1330 (Fed. Cir. 2008). "We review the interpretation of a contract—a question of law—without deference." *Id.* at 1335.

Generally, when imported merchandise that should not have been admitted into U.S. commerce has been released, Customs "shall promptly make demand for the redelivery of the merchandise" to its custody. *See* 19 C.F.R. §§ 133.26, 141.113(d). In this case, Customs issued the redelivery notice on the basis that the merchandise contained a counterfeit certification mark in violation of § 1526(e). In relevant part, § 1526(e) provides that any merchandise bearing a counterfeit mark (within the meaning of 15 U.S.C. § 1127) that is imported into the United States in violation of 15 U.S.C. § 1124 "shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws." Section 1124 forbids the importation of merchandise that "copy or simulate" a registered trademark. Certification marks are covered by these provisions. *See Audek Model Clock Radios*, 220 F.3d at 540; *Computer Towers*, 152 F. Supp. 2d at 1196 (holding that § 1124 covers certification marks). Thus, under § 1526(e), the government "shall . . . seize[] and . . . forfeit[]" any merchandise that is of foreign manufacture, was imported in violation of § 1124, and bears a counterfeit certification mark within the meaning of § 1127.

The question of whether Customs properly denied ICCS's protest turns on whether the PREMIUM model canisters at the time of importation displayed a "counterfeit" certification mark within the meaning of § 1127. Section 1127 defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." The parties do not dispute that the mark

displayed on the PREMIUM model canisters at the time of importation was identical to UL's registered certification mark. *ICCS*, 357 F. Supp. 3d at 1322. The only question, therefore, is whether the mark was "spurious."

A "spurious" mark is one that is false. *See* BLACK'S LAW DICTIONARY (10th ed. 2014); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (2002); *see also* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673, 31675 (1984) ("As [an earlier] Senate bill indicated, 'spurious' means 'not genuine or authentic.'"). "Counterfeit certification marks falsely imply that the merchandise has been tested and approved for safety." *Computer Towers*, 152 F. Supp. 2d at 1197. The record shows that ICCS's use of UL's certification mark on the date of entry falsely communicated to consumers that the imported PREMIUM model merchandise had already passed UL's safety standards and requirements, and that UL had already given its safety certification to the PREMIUM model—when that certification had not, in fact, happened. That is a misleading use of UL's certification mark and renders the mark a "spurious" mark.

On appeal, ICCS challenges the Court of International Trade's conclusion that ICCS needed "express authorization" from UL *prior to* using the certification mark on new models that correspond to the MEGA-1 basic product. Appellant's Br. at 21. We conclude, as did the Court of International Trade, that the relevant contract provisions required ICCS to obtain express authorization *prior to* using UL's certification mark on new models. *ICCS*, 357 F. Supp. 3d at 1323–24. The Service Terms ¶ 8 prohibits ICCS from using UL's certification mark "on any goods or their containers or packaging" "[e]xcept as otherwise *expressly authorized* by UL." J.A. 265 (emphasis added); *see also* J.A. 310 (Global Services Agreement ¶ 8 providing that ICCS "ha[s] no rights in the [UL] Marks" "[e]xcept for

[those] rights as specifically granted in a Service Agreement to use the Marks").

The Service Terms set forth a specific procedure for obtaining UL's "express authoriz[ation]" for any new models. Specifically, the Service Terms ¶¶ 2, 4 require ICCS to make a "Multiple Listing Request[]" when it wants to "[a]dd . . . products . . . within an existing Multiple Listing Relationship." J.A. 263–64. The Multiple Listing Request "shall inform UL . . . in writing of the *Basic Product* by name of [OJC] . . . and identify[] . . . [the] *model* . . . for which the [Multiple Listing] Service is desired," according to ¶ 4(b). J.A. 264 (emphases added). "The product(s) for which [Multiple Listing] Service is requested shall not differ from the Basic Product(s) other than in . . . features that *UL . . . deems to be superficial*" pursuant to ¶ 6(a). *Id.* (emphases added). If UL finds "the product(s) . . . to be eligible for M[ultiple ]L[isting] Service, UL . . . will add a Multiple Listing, Recognition, Verification, or Classification Correlation Sheet . . . covering the Basic Product(s) to authorize the manufacturer of the Basic Product(s) to use the Mark on the product" pursuant to ¶ 7(a). *Id.*

ICCS failed to carry out this specific procedure prior to using UL's certification mark on the PREMIUM model canisters in question. As of the date of entry (on January 19, 2017), ICCS had yet to make a Multiple Listing Request to UL to add the PREMIUM model to UL's multiple listing services, as directed by the Service Terms ¶¶ 2, 4. As a result, UL had not yet had an opportunity to evaluate whether any "differ[ences] from the Basic Product[]" were merely "superficial" and whether the PREMIUM model was "eligible . . . to use [UL's] Mark" pursuant to Service Terms ¶¶ 6(a), 7(a). Therefore, we agree with the Court of International Trade that ICCS lacked UL's "express authorization to display UL's certification mark on the PREMIUM model on the date of importation." *ICCS*, 357 F. Supp. 3d at 1324. We likewise agree with the court's

analysis concluding that "the certification mark was spurious and, therefore, counterfeit." *Id.*

*Audek Model Clock Radios*, cited by the Court of International Trade, is a Seventh Circuit case with analogous facts addressing whether the UL certification mark displayed on imported merchandise was counterfeit. 220 F.3d at 540. That case involved the seizure and forfeiture of imported clock radios, bearing the UL certification mark, which had been manufactured in China, and the importer's "attempt to regain possession of the . . . clock radios" from Customs. *Id.* Like ICCS, the importer in *Audek Model Clock Radios* had a valid contract with UL, which authorized affixing UL's certification mark *only* on clock radios manufactured "at the location[s] of manufacture . . . specified in the [contract]." *Id.* at 541. Pursuant to the original contract, the importer "was allowed to affix UL's [certification] mark to [clock] radios manufactured in China" because the original contract "list[ed] the factory in China . . . as an authorized manufacturing location," and the importer had "arranged and paid for UL inspections of the clock radios manufactured in the plant in China." *Id.* The original contract was then "modified" to "eliminat[e] China as an authorized location for radio production" and to specify a factory in Chicago as the only authorized manufacturing location. *Id.* at 541, 543. "UL [also] ceased their periodic inspections of clock radios manufactured at the Chinese factory." *Id.* at 541. After the contract was modified, the importer attempted to import clock radios manufactured in China bearing UL's mark despite the fact it was no longer authorized to do so. *Id.* at 541–42. The Seventh Circuit held that the importer's use of UL's certification mark was unauthorized and that the clock radios were properly seized by Customs. *Id.* at 540. The facts and rationale in *Audek Model Clock Radios* are similar in relevant part to the present case.

ICCS makes various arguments for why its usage of UL's certification mark on its PREMIUM model canisters

was not counterfeit. ICCS contends that the absence of UL's express authorization for the PREMIUM model on the date of entry should not be dispositive in this case, given that ICCS later successfully obtained UL's authorization. *See* Appellant's Br. at 17, 24–25. We disagree. It is of no moment that, post-importation, UL approved ICCS's request to add the PREMIUM model to UL's multiple listing services, because that occurred *after* the date of entry on January 19, 2017, and the counterfeiting analysis is focused on the time of importation. *See* 19 U.S.C. § 1526(a) (barring the importation of goods bearing a registered U.S. trademark without the trademark owner's written consent "at the time of making entry"); *see also Audek Model Clock Radios*, 220 F.3d at 541–43 (holding that the UL certification mark displayed on imported merchandise manufactured in China was counterfeit because, even though the importer's original contract with UL authorized it to do so, the modified contract in force *at the time of importation* no longer allowed for manufacturing in China).

ICCS also asserts it was reversible error for the Court of International Trade to not analyze likelihood of confusion by applying the *DuPont* factors. Appellant's Br. at 8, 32; *Application of E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973) (listing thirteen factors relevant to likelihood of confusion determination). The Court of International Trade determined that the merchandise displayed a counterfeit certification mark under the proper legal framework. ICCS has not shown reversible error in the court's counterfeiting analysis, given that it is undisputed that the PREMIUM model canisters display a mark that is identical to the UL certification mark. *ICCS*, 357 F. Supp. 3d at 1322. ICCS does not explain what more the Court of International Trade should have analyzed in this case once it found that ICCS used UL's exact certification mark without UL's prior approval, nor does ICCS explain how it was prejudiced.

Next, ICCS alleges that the addition of the "PREMIUM" brand label to the canisters was superficial, as it "did not materially alter the physical assembly of the product," and that the PREMIUM model is the same physical product as the MEGA-1 basic product. Appellant's Br. at 14–15; Oral Arg. at 2:40–4:10, 17:15–40. Along the same lines, ICCS argues that the delay in updating the multiple listing was a minor procedural oversight that caused no harm to UL. Appellant's Br. at 11, 22, 24–25.

ICCS's arguments as to physical similarity between the PREMIUM model and other merchandise that UL had previously certified fail because the Service Terms dictate that it is UL—not ICCS—who determines whether any "differ[ences] from the Basic Product . . . [are] superficial." *See* J.A. 264. The contract prohibits ICCS from unilaterally deciding to use UL's certification mark on a new model. Thus, according to the contract, UL retained the right to police which models would be listed on its Online Certifications Directory and would receive approval to bear its certification mark. As of the date of entry, UL had not yet determined whether the PREMIUM model was physically similar to the MEGA-1 basic product because ICCS had not requested for UL to do so yet.

The importer's actions and arguments in this case raise serious concerns about the trademark owner's ability to monitor the use of its certification mark. An owner of a certification mark has an affirmative duty to police the use of its certification mark in order to protect the public's expectation that all products sold under the certification mark comply with applicable safety standards and requirements. *Cf. Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 992–93 (9th Cir. 2006) ("[W]hen the owner of a trademark licenses the mark to others, he retains a duty to exercise control and supervision over the licensee's use of the mark . . . to protect the public's expectation that all products sold under . . . [the] mark derive from a common source and are of like quality.") (internal quotation marks omitted); *Nitro*

*Leisure Prods., L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1367 (Fed. Cir. 2003) ("Trademark law requires that the trademark owner police the quality of the goods to which the mark is applied.") (Newman, J., dissenting). Common sense suggests that if an importer could unilaterally choose to use a certification mark on new models without first obtaining consent from the trademark owner, that would significantly compromise the trademark owner's ability to police the mark. *See Miller*, 454 F.3d at 993.

Moreover, on the date of entry, Customs had no way of ascertaining whether the PREMIUM model was the same physical product as the MEGA-1 basic product (or the US BUTANE model), without UL having first made that determination. ICCS would have Customs bear the burden of performing UL's inspection, comparison, and authorization for use of UL's trademark. That is an unreasonable burden to place on Customs; further, it is contrary to statute. *See* 19 U.S.C. §§ 1526(a), (e) (providing that an importer must have "written consent of the [U.S. trademark] owner" to import merchandise bearing that trademark and, if not, Customs may seize the merchandise, providing "noti[ce to] the owner of the trademark," and, with the trademark owner's consent "obliterate the trademark where feasible"). Customs, for its part, complied with all applicable statutes and regulations in requiring redelivery of ICCS's imported merchandise in the absence of UL's written consent, at importation, for use of its trademark on that merchandise. *See, e.g.*, 19 C.F.R. § 133.26 (providing that, if Customs determines "that merchandise which has been released from [Customs'] custody" may bear a counterfeit mark, Customs "shall promptly make demand for [its] redelivery").

Finally, ICCS contends that the "extreme" remedies of seizure and forfeiture are unreasonable in its case because it is an importer with a valid license agreement with UL rather than a "rogue actor pawning off UL's mark." Appellant's Br. at 10–11. Regardless of ICCS's intent, the law is

clear that counterfeit merchandise "shall be seized and, in the absence of the written consent of the trademark owner, forfeited" and may not be released by removing the offending mark or by diverting the merchandise to another nation. § 1526(e); McCarthy on Trademarks § 29:45.

Congress contemplated protecting both trademark owners and consumers from circumstances such as the one present here. In 1996, Congress amended 19 U.S.C. § 1526 to address concerns about the health and safety threats posed by counterfeit merchandise to United States consumers. *See* Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104–153, 110 Stat. 1386, § 2. Here, ICCS marketed counterfeit merchandise that not only risked damaging UL's reputation, but also was potentially dangerous to consumers.

## II. Other Issues

ICCS also alleges that, in denying ICCS's protest, Customs inappropriately relied on UL's lack of consent to the point of "delegat[ing] . . . its statutory duty to enforce the trademark laws" to UL and "render[ing] Customs an enforcement arm of private interests." Appellant's Br. at 27–29. We disagree.

Section 1526(e) expressly conditions forfeiture of the merchandise on "the absence of the written consent of the trademark owner" and states that "[u]pon seizure of such merchandise, [Customs] shall notify the owner of the trademark." Thus, Customs was required by statute to contact UL upon seizure of ICCS's merchandise to ascertain whether or not UL consented to the use of its mark under the circumstances. *See* § 1526(e); *see also Computer Towers*, 152 F. Supp. 2d at 1202. The record shows that Customs' communications with UL were directed to investigating whether UL consented to the use of its certification mark to determine whether or not the certification mark displayed on the PREMIUM model canisters was counterfeit. *See* J.A. 291–302. UL possessed the best

evidence on these issues, and ICCS was free to rebut the evidence provided by UL. *See Computer Towers*, 152 F. Supp. 2d at 1202.

Finally, ICCS alleges that the Court of International Trade committed an abuse of discretion by granting ICCS a limited discovery period rather than a full discovery period. Appellant's Br. at 29–32. We review a trial court's denial of a request for time to conduct additional discovery under Rule 56(d) for abuse of discretion. *See Rosebud LMS Inc. v. Adobe Sys. Inc.*, 812 F.3d 1070, 1073 (Fed. Cir. 2016). If a party "shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition" to a motion for summary judgment, the court may "allow time . . . to obtain discovery." Ct. Int'l Trade R. 56(d). The moving party must "state with some precision the materials [it] hopes to obtain with further discovery, and exactly how [it] expects those materials would help [it] in opposing summary judgment." *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996). The moving party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Id.* Here, ICCS makes only vague assertions as to why additional discovery is needed. ICCS fails to specifically identify how the additional discovery would allow it to meet its burden in opposing summary judgment. Accordingly, ICCS has not shown that the court abused its discretion.

CONCLUSION

For the foregoing reasons, we affirm the Court of International Trade's grant of summary judgment to the government.

**AFFIRMED**